Eleanor J. HAFNER, petitioner, Appellant,

v.

Donald S. HAFNER, Respondent.

No. 50783.

Supreme Court of Minnesota.

July 3, 1980.

Larkin, Hoffman, Daly & Lindgren, James P. Miley, Ember D. Reichgott, and Wendell R. Anderson, Minneapolis, for petitioner, appellant.

Collins, Buckley, Sauntry & Haugh, William E. Haugh, Jr., and Patrick T. Tierney, St. Paul, for respondent.

Heard before PETERSON, SCOTT, and WAHL, JJ., and considered and decided by the court en banc.

SCOTT, Justice.

This is an appeal from a decision of the Second Judicial District Court which upheld the validity of an antenuptial agreement entered into between appellant Eleanor Hafner and respondent Donald Hafner. We affirm.

The Hafners were married on October 12, 1972, in Carson City, Nevada. They first met in late 1957 or early 1958 when appellant began working for Hafner's Restaurant and Hillcrest Bowling.[1] At the time, appellant was approximately 21 years old and married to her first husband, Don Adams, from whom she was divorced in 1962. Respondent was about 39 years of age and married to Valerie Hafner, his first wife; this marriage was dissolved on September 14, 1972.

Within one year of her employment at the restaurant and bowling alley, appellant began to date respondent and almost immediately thereafter they became intimate.

---

1. These businesses are located in close proximity to each other in the Hillcrest Shopping Center. Hafner's Restaurant is owned in equal part by respondent and his brother. Respondent owns 98% of the stock in Hillcrest Bowl, and his son, Joel, holds the remaining 2%.

The parties eventually lived together for two years during 1964–65. The relationship was subject to many periods of separation allegedly caused by respondent's "chasing" of other women and physical abuse of appellant. Approximately one year before the marriage, respondent proposed to appellant. On the same night, however, appellant discovered respondent bringing a "young girl" to his apartment and as a result the relationship was broken off for about five months. Appellant stated that upon resumption of the relationship respondent "talked marriage right away," but she "didn't trust him" and thus did not immediately agree to marry respondent. Finally, in late September 1972, about three weeks before the marriage, appellant accepted respondent's proposal.

Around that time, respondent requested his attorney, Harold Shear, to draft an antenuptial agreement. Appellant claims that respondent first mentioned the agreement to her when the wedding date was set, which occurred about two weeks before the marriage and one week before the contract was signed. On that occasion, according to appellant, respondent told her that she was going to "sign Hafner's away." She testified that the matter was again brought up on October 5, 1972, when respondent informed her that they were going down to Shear's office to sign the document. In regard to the parties' discussion of the antenuptial contract, respondent testified as follows:

Q What conversation did you have with Elly about this document prior to the signing?

A Well, I told her that I was—if we were to get married, that I wanted Harold to prepare a document such as he did, and I gave her a couple of reasons.

Q What were those reasons?

A Well, one was I told her that in the event that we didn't make it, I felt as though she hadn't contributed in any way to what I owned, and another thing was that I felt as though that if something did happen to me, an accident, die, that Eleanor would not stay single, and I just felt as though I didn't work—that my main interest in life, my work, was for my children. I felt as though they were entitled to everything that I had worked for.

Appellant signed the document in Shear's office on October 5, 1972, in the presence of Shear, respondent, and Marvin Lind, an attorney in the Shear law firm who was then acting in the capacity of a notary public. Appellant was not represented by counsel. The entire signing process took twenty to thirty minutes. Appellant stated that she does not recall reading the agreement. She claimed that Shear did not advise her to see another attorney, but she admitted that she was aware that Shear was representing respondent. Appellant also contended that Shear told her that the agreement only concerned Hafner's (apparently the restaurant and bowling alley), and did not affect property acquired subsequent to the marriage. Further, she asserted that, at the time of the signing, she did not have knowledge of respondent's property, except for his ownership of Hafner's.

Shear stated that he advised appellant that she could consult her own attorney on the matter. He further testified:

Q You have indicated you informed her about her right to have counsel and advice in this regard?

A Um-hum.

Q What was her response to that?

A Well, her response was: I know what it is and everything is fine. It was, the conversation was first an introduction where I met her.

Q I'm going to get into that. I like to do it my own way.

A I'm sorry. She said I know. I shouldn't say she said, I don't know exactly what her words were. The tenor of the conversation was: I know what it is and this is fine.

\* \* \* \* \* \*

Q What questions did Mrs. Hafner ask you that you recall?

A None.

Q She asked no questions whatsoever?

A Not to my knowledge. Not about the agreement.

Q What advice, if any, did you give her instruction about in this matter?

A I didn't give her advice. I told her it was an antenuptial agreement. And I asked her did she understand it and was there any question in your mind or anything that had been represented generally, that's what I said. She said no, that's fine.

   *    *    *    *    *    *

Q You did not seek to give her any legal advice?

A No.

Q What did you say to her in regard to obtaining legal advice before signing this document?

A Well, initially in the conversation, without remembering my exact words, you know, this is a legal document. And I don't know exactly what I said. But I went through a, you know, you have to understand it, and you should have your own attorney. And if you wish to have an attorney, you can have one.

Q Do you recall specifically what response you got from Mrs. Hafner in this regard?

A Generally my recollection is: I know what it is. This is what we want. And it's fine. Everything was—there was no real hesitation at all. She seemed to know and understand what it was and what she wanted to do when they walked in the door.

Shear conceded that he did not discuss with appellant the provisions of the Minnesota Probate Code and the rights she would have thereunder in the absence of a valid antenuptial agreement. Respondent testified that Shear told appellant she could consult her own attorney if she so desired. Also, according to respondent, at the signing appellant, Shear, and respondent were given copies of the agreement and all read the document.

The language of the agreement entered into by the parties provides as follows:

WHEREAS, Donald S. Hafner and Eleanor Joan Carpenter intend to be married; and

WHEREAS, THE SAID Eleanor Joan Carpenter is aware and has been fully informed of the financial condition of Donald S. Hafner and is aware of the obligation of the said Donald S. Hafner to his former wife and his children; and

WHEREAS, it is the desire of the parties that neither make claim in the estate of the other;

NOW, THEREFORE, IT IS AGREED AS FOLLOWS:

1. Donald Hafner agrees that he will maintain policies of insurance on his life in the face value of Fifteen Thousand ($15,000.00) Dollars. Said policies shall designate Eleanor Joan Carpenter as primary beneficiary and shall provide for payment to her of that sum upon the death of Donald Hafner.

2. The said Eleanor Joan Carpenter acknowledges that the present approximate net worth of Donald S. Hafner may be in excess of Seven Hundred Fifty Thousand ($750,000.00) Dollars and she has given consideration to these facts and for entering into this Agreement freely with full understanding of its provisions and without any promises or inducements not contained in this Agreement.

3. The parties agree after the solemnization of the marriage between the parties, each of them shall separately retain all rights in his or her own property, real, personal or mixed, whether now owned or hereafter acquired, and each of them shall have the absolute and unrestricted right to dispose of such separate property, free from any claim that may be made by the other by reason of their marriage, and with the same effect as if no marriage had been consummated between them.

4. Each of the parties waives and releases any rights as surviving spouse to elect to take against the other's Will whether heretofore or hereafter made.

5. Each party shall, upon the request of the other, execute, acknowledge, and deliver any instruments appropriate or necessary to carry into effect the intentions and provisions of this Agreement.

6. This Agreement shall inure to the benefit of and shall be binding upon the heirs, executors and administrators of the parties.

The record discloses that although respondent had a minimal education (she quit school in ninth grade), she had the ability to read the document.

On August 12, 1977, appellant commenced a marriage dissolution proceeding against respondent. Respondent counterpetitioned to dissolve the marriage and asserted that appellant could not claim an interest in any of his property due to the operation of the antenuptial agreement entered into by the parties.[2] On appellant's motion, the question relating to the validity of the antenuptial contract was tried separately from the other issues raised in the dissolution proceeding. The matter was submitted to the trial court for decision on the basis of the depositions of the parties and witness Shear, and arguments of counsel. On November 2, 1979, the trial court concluded that the antenuptial agreement was valid and thus appellant "shall have no right, title or interest in property of [Donald Hafner] as if no marriage had been consummated." As part of his decision, the district court set a trial date for the remaining issues.

By notice of appeal dated November 26, 1979, appellant sought review of the district court decision. As a result, trial of the remaining issues was stayed pending this court's disposition of the appeal.[3]

The issues presented for our consideration are the following:

(1) Did the trial court err in determining that the antenuptial agreement is valid?

(2) Do the terms of the antenuptial agreement apply in the event of divorce?

1. Antenuptial contracts are viewed with favor by the law, as they are specifically sanctioned by statute, Minn. Stat. § 519.08 (1978). In addition, this court has repeatedly acknowledged that such agreements promote important social functions. E. g., Appleby v. Appleby, 100 Minn. 408, 111 N.W. 305 (1907); In re Estate of Malchow, 143 Minn. 53, 172 N.W. 915 (1919). As stated in Appleby, supra :

Marriage settlements * * * are matters of history, and have been upheld and sustained by the courts from the earliest times. They are not against public policy, but, on the contrary, are regarded with favor, as being conducive to the welfare of the parties and subservient to the best purposes of the marriage relation, and are uniformly sustained when free from fraud or not expressly prohibited by some statute.

100 Minn. 418, 111 N.W. 307.

The trial court's conclusion that the antenuptial agreement involved here is valid finds sufficient support in the record. In re Estate of Jeurissen, 281 Minn. 240, 161 N.W.2d 324 (1968). As in the Jeurissen, supra, case, the evidence here indicates that, although appellant was not told of her rights in the absence of an antenuptial contract, she was aware of, and freely and

---

2. As respondent informed this court at oral argument, he does not contend that the antenuptial agreement precludes appellant from receiving maintenance pursuant to Minn.Stat. § 518.552 (1978).

3. Since issues remain to be resolved by the trial court, the instant appeal is a piecemeal one. As such, the matter is not appealable as of right unless judgment is entered and the trial court expressly determines that there is "no just reason for delay" in the entry of judgment. See, Minn.R.Civ.P. 54.02; Financial Relations Board v. Pawnee Corp., 308 Minn. 109, 240

N.W.2d 565 (1976); Buchman Plumbing Co. v. Regents of Univ. of Minn., 298 Minn. 328, 196 N.W.2d 629 (1972). In this case, neither has a judgment been entered nor the requisite determination been made and, consequently, the trial court's decision is not properly appealable as of right at this point in the litigation. However, since the briefs have been filed in the case, oral argument has been held, and later appeal in this matter appears unlikely, we hereby grant discretionary review pursuant to Minn.R.Civ. App.P. 105.

voluntarily acceded to, respondent's desire to leave his property to his children. Further, again similarly to *Jeurissen*, the record discloses that appellant was a reasonably intelligent and experienced individual, even though she has a limited formal education. Thus, consistent with the *Jeurissen* decision, we hereby uphold the trial court's determination regarding the validity of the antenuptial contract.

2. Appellant next argues that even if the antenuptial agreement is valid, its terms only apply in the event of death and do not control when the marriage is dissolved. We are unpersuaded by this contention.

The agreement provides, in pertinent part, that:

The parties agree after the solemnization of the marriage between the parties, each of them shall *separately retain* all rights in his or her own property, real, personal or mixed, *whether now owned or hereafter acquired,* and each of them shall have the *absolute and unrestricted right* to dispose of such separate property, *free from any claim that may be made by the other by reason of their marriage, and with the same effect as if no marriage had been consummated between them.*

(Emphasis added.) This clear and unambiguous language operates to govern disposition of the parties' property upon dissolution of their marriage. Our conclusion is supported by the decision in *Lenzmeier v.*

*Lenzmeier,* 304 Minn. 568, 231 N.W.2d 71 (1975), where provisions of an antenuptial agreement similarly worded to the instant contract[4] were found to be of a "comprehensive purview" and thus applicable upon any termination of the marital relationship. *See, also, Dingledine v. Dingledine,* 258 Ark. 204, 523 S.W.2d 189 (1975).

Affirmed.

KELLY, Justice (concurring specially).

I concur in the result in this case. However, I do not believe that Minn.Stat. § 519.08 (1978) either approves or disapproves antenuptial contracts. In my opinion, antenuptial agreements effective in case of divorce should not have the same force and effect as those effective on the death of one of the parties. Furthermore, the state has an interest in a marriage. That interest, among other things, should be to ensure, if reasonably possible, that the spouse upon divorce would not become dependent upon the state for support. The courts should scrutinize antenuptial agreements such as the one in the instant case with all interests of the state in mind. *See* 35 Minn.L.Rev. 504 (1951).

4. The relevant paragraphs of the Lenzmeier antenuptial agreement read:

1. That all properties of any kind or nature, real, personal or mixed wherever the same may be found, which belong to each party shall be and forever remain the personal estate of said party including all interest, rents and profits which may accrue therefrom.

2. That the parties hereby declare it to be their intention that during their marriage each of them shall be and continue to be completely independent of the other as regards the enjoinment [sic] and disposal of all property, whether owned by either of them at the commencement of the marriage or coming to either of them during the marriage. Accordingly, they agree that all property be-

longing to either of them at the commencement of the marriage or coming to either of them during the marriage shall be enjoyed by him or her, and be subject to the dispositions of him or her, as his or her separate party [sic], and after the death of either it shall be free from any claim by the other on account of dowry, courtesy [sic] or other statutory right in the same manner as if the marriage had never been celebrated.

304 Minn. 569, 231 N.W.2d 73. It should be noted that the *Lenzmeier* court concluded, due to a specific provision in a different portion of the contract, that the agreement did not control disposition of the parties' homestead upon marriage dissolution. 304 Minn. 571, 231 N.W.2d 74. No similar qualifying provision is found in the Hafner antenuptial agreement.