**In Re the Marriage of Tom H. HILL, petitioner, Respondent,**

v.

**Carolyn A. HILL, Appellant.**

**In Re the Marriage of Tom H. HILL, petitioner, Appellant,**

v.

**Carolyn A. HILL, Respondent.**

**Nos. CX–84–144, C7–84–330 and C5–84–665.**

Court of Appeals of Minnesota.

Sept. 25, 1984.

Steven Heikens, Popham, Haik, Schnobrich, Kaufman & Doty, Minneapolis, for Carolyn A. Hill.

Heard, considered, and decided by POPOVICH, C.J., and PARKER and HUSPENI, JJ.

## OPINION

HUSPENI, Judge.

The wife appeals from a dissolution decree which upheld the validity of an antenuptial agreement. Pursuant to that agreement, wife was awarded a $20,000 property settlement and no maintenance. The husband appeals the award of retroactive child support and the award of attorney's fees to enable the wife to prosecute an appeal, contending the award was precluded by the antenuptial agreement. We affirm in part, reverse in part, and remand.

## FACTS

Carolyn and Tom Hill were married in 1974. Each had been married and divorced before. At the time of the marriage, the wife owned insignificant personal property and a car worth a few thousand dollars. The husband owned real estate and personal property worth approximately $750,000. Husband insisted that wife sign an antenuptial agreement as condition of marriage. There was no bargaining over the terms of the agreement.

The wife selected Paul Rockne, the attorney who handled her first divorce, to draft the agreement. Rockne perceived both parties as his clients and drafted the agreement as instructed without offering independent advice to either party. He billed the husband for the work.

The agreement, which was taken almost verbatim from a form book, provided in part:

WHEREAS, each of the parties hereto has previously been married, * * * and is desirous that each one should hold his or her undivided property then in possession or which might thereafter be acquired, separate and apart, without mo-

William J. Baudler, Baudler, Baudler & Maus, Austin, for Tom H. Hill.

lestation or interference of the other, the same as though no marriage relation exists, it is mutually agreed and understood that neither of the above named parties, by reason of said contemplated marriage hereafter to be consummated, shall have or take any right, title or interest in or to the property of the other, either during their lives nor [sic] after the death of either of them. * * *

[I]n the event either of the parties * * * are unable or unwilling to continue the marriage arrangement * * * neither of the parties hereto shall be entitled to any alimony, support money, costs, attorney's fees, or to any other money by virtue thereof. This provision may be cited by either party in any court of competent jurisdiction, as a waiver and release of any money payment aforesaid, by one to the other; provided, however, [the wife] may claim $50,000 from [the husband] in lieu of a property settlement in such divorce or judicial separation * *

The Hills signed the agreement on January 12, 1974, two days before they were married. At the signing, the husband demanded that the sum payable in lieu of a property settlement be reduced to $20,000. The wife acceded.

Before the couple visited Rockne, the wife knew generally that the husband was a wealthy man; that he owned his home, two apartment buildings, several farms, and an office building. He took her to visit several of his properties, but he never specifically informed her of the extent of his property, its market value, the encumbrances against it, or his own net worth.

At Rockne's office, in the wife's presence, the husband stated his net worth as between $300,000 and $400,000. That figure was consistent with the findings of fact from husband's September 1973 divorce, but not with his January 1974 financial statement prepared after the parties' marriage. That statement listed his net worth at $750,000. The trial court found that the increase resulted from the explosive growth of real estate prices during the period.

At the dissolution hearing, the wife testified that she knew and understood the terms of the agreement when she signed it. She said she was not concerned with the nature or extent of her husband's property and would have signed the agreement "whether he had two million dollars or two hundred dollars."

At the time of the dissolution, the parties owned property in an amount approximating $2,750,000. Their marital property totalled $1,260,398.

The husband's after-tax income during the marriage was at least $3,000 per month. The trial court found him to be a talented and astute businessman, with the ability to generate substantial future income. Husband adopted wife's child on July 5, 1974.

Wife is a high school graduate with two years of college. Prior to the parties' marriage, she worked at a clerical job, with gross income of $125 per week. After the parties' marriage, she worked with husband in his real estate business. She has a real estate license. In 1975 she was diagnosed as diabetic. She also suffers from severe emotional problems. In 1961 she was hospitalized because of a psychotic episode. She recovered and was able to function normally. Since 1980 she has had several more psychotic episodes. Doctors have diagnosed her as suffering from manic-depressive illness with acute psychotic phases. She must take several prescribed medicines to control the symptoms. She has high medical expenses and limited earning potential.

### ISSUES

1. Did the trial court err in finding a valid antenuptial agreement?

2. Did the trial court err in finding that the antenuptial agreement covered marital property?

3. Have changed circumstances rendered the maintenance provision of the antenuptial agreement unconscionable?

4. Did the trial court err by awarding retroactive child support?

5. Did the trial court err by awarding attorney's fees for appeal, but not for trial?

## ANALYSIS

1. Minnesota has long recognized and favored antenuptial agreements governing disposition of the parties' estates upon death. *Appleby v. Appleby*, 100 Minn. 408, 111 N.W. 305 (1907); *In re Estate of Malchow*, 143 Minn. 53, 172 N.W. 915 (1919). The state also recognizes the validity of antenuptial agreements governing property settlements upon dissolution. *Englund v. Englund*, 286 Minn. 227, 175 N.W.2d 461 (1970). Minn.Stat. § 519.11 (1982) codifies the current requirements for a valid antenuptial agreement.

> Subdivision 1. A man and woman of legal age may enter into an antenuptial contract or settlement prior to solemnization of marriage which shall be valid and enforceable if (a) there is a full and fair disclosure of the earnings and property of each party, and (b) the parties have had an opportunity to consult with legal counsel of their own choice. An antenuptial contract or settlement made in conformity with this section may determine what rights each party has in the nonmarital property, * * *, upon dissolution, * * * and may bar each other of all rights in the respective estates not so secured to them by their agreement. This section shall not be construed to make invalid or unenforceable any antenuptial agreement or settlement made and executed in conformity with this section because the agreement or settlement covers or includes marital property, if the agreement or settlement would be valid and enforceable without regard to this section.

> \* \* \* \* \* \*

> Subdivision 5. An antenuptial contract or settlement duly acknowledged and attested shall be prima facie proof of the matters acknowledged therein and as to those matters, the burden of proof shall

be and rest upon the person contesting the same.

Since the Hills' antenuptial agreement was entered into before the enactment of the statute, it is governed by the common law. The common law differs from the statutory scheme with regard to which party has the burden of proving disclosure and opportunity to consult with counsel.

 At common law, a presumption of fraud arises where the parties to an antenuptial agreement stand in a confidential relationship to one another and there is inadequate consideration to support their agreement. *Estate of Serbus v. Serbus*, 324 N.W.2d 381 (Minn.1982). That presumption applies here. The Hills had a confidential relationship by virtue of their contract to marry. *In re Estate of Malchow*, 143 Minn. at 59, 172 N.W. at 917. $20,000 was clearly inadequate consideration to support the wife's waiver of all rights upon dissolution of marriage or her husband's death.

 At common law, to overcome the presumption of fraud, the proponent, not the contestant, has the burden of showing "there was no fraud or concealment, and that [the other party] knew the extent, character and value of his property and the nature and extent of her rights as his wife and widow." *Slingerland v. Slingerland*, 115 Minn. 270, 275, 132 N.W. 326, 328 (1911). To establish a valid antenuptial agreement at common law, the proponent must prove both full disclosure of assets and the contestant's knowledge of the right to independent counsel. *Serbus*, 324 N.W.2d at 385. The trial court here found that husband succeeded on both counts.

 The husband's disclosure of his net worth ($300,000 to $400,000) fell far short of his actual net worth ($750,000). This understatement gave the wife a grossly deflated view of her husband's estate. However, the record as a whole does support the trial court's finding that the discrepancy was a good faith error resulting from explosive growth in the real estate market.

The trial court found the *Serbus* ruling controlling as to the requirement that a party have the opportunity to consult with legal counsel of one's choice. In *Serbus*, as in this case, the wife selected the attorney, but the husband dictated the terms of the agreement. The attorney in *Serbus* advised the wife of her statutory inheritance rights, and she knew the extent of her husband's property. The Supreme Court found that the wife's rights were adequately protected in such circumstances, but noted

> We do not, however, underestimate the importance of independent legal counsel, especially in cases where it is not clear on the record that the party giving up an interest was advised of the nature and extent of the other's property.

*Serbus,* 324 N.W.2d at 386.

Here, Rockne did not advise wife of her statutory inheritance rights nor about divorce laws at the time. He did not review with her the nature and extent of her husband's property, nor did he independently counsel wife. Despite these contrasts between *Serbus* and this case, the trial court did find that the wife's "right to independent counsel was met when she suggested Rockne as the attorney to draft the agreement." Although the application of the *Serbus* rationale to this case is strained, we do not believe the trial court committed error in making that application.

Ultimately, other factors present here aid us in upholding the trial court's determination that the common law requirements as to disclosure and independent counsel were met. Wife's testimony at trial that she knew and understood the terms of the agreement and that she would have signed it regardless of the amount of her husband's assets is strongly persuasive. We cannot protect wife from an agreement merely because it was unwise. The trial court found wife's testimony to be dispositive of the issue of validity of the agreement, and the trial court's determination is not clearly erroneous.

2. We next address the scope of the provisions of the antenuptial agreement.

The parties intended the agreement to cover marital property. The agreement expressly refers to the parties' desire to maintain separate estates as to property "then in possession or which might thereafter be acquired" without any interest of the other to the property "either during their lives nor [sic] after the death of either."

Under Minn.Stat. § 519.11, subd. 1 (1982), that would not be possible. That statute provides that antenuptial contracts may govern only the disposition of nonmarital property. Agreements attempting to cover both marital and nonmarital property rights must be severed, with effect being given only to provisions dealing with nonmarital property. However, Section 519.11 was enacted five years after the parties signed this antenuptial contract and does not govern this case.

The validity, at common law, of antenuptial agreement provisions governing the disposition of marital property is a question of first impression. The trial court, in a well-reasoned and written decision, found that, at common law, such provisions may be valid, and determined that the Hills' agreement was enforceable with respect to marital property. We agree.

The Minnesota Supreme Court has never ruled directly on the question of whether at common law marital property may be the subject of an antenuptial agreement. However, the court's analysis in two cases involving antenuptial contracts entered into before enactment of Minn.Stat. § 519.11 suggests antenuptial agreement provisions governing the disposition of property acquired after the marriage are enforceable. In *Lenzmeier v. Lenzmeier,* 304 Minn. 568, 231 N.W.2d 71 (1975), the court considered whether disposition of the homestead was controlled by the following provision:

> That the parties hereby declare it to be their intention that during their marriage each of them shall be and continue to be completely independent of the other as regards the enjoinment [sic] and disposal of all property, whether owned by either of them at the commencement of the

marriage *or coming to either of them during the marriage.* Accordingly, they agree that all property belonging to either of them at the commencement of the marriage *or coming to either of them during the marriage* shall be enjoyed by him or her, and be subject to the dispositions of him or her, as his or her separate party [sic] * * *

304 Minn. at 569, 231 N.W.2d at 73 (emphasis added). The *Lenzmeier* court found that another provision in the antenuptial agreement excluded the homestead from the "comprehensive purview" of the language cited above. It determined that "the event of divorce cast this homestead property into that category of assets to be dealt with during the divorce proceeding." 304 Minn. at 571, 231 N.W.2d at 74. However, the clear implication in *Lenzmeier* was that disposition of property acquired during the marriage could be governed by an antenuptial agreement.

*Hafner v. Hafner*, 295 N.W.2d 567 (Minn.1980) also supports enforcement of agreements governing property acquired during the marriage. In *Hafner*, appeal was taken from a partial summary judgment holding that the parties' antenuptial agreement was valid and controlling upon dissolution. The procedural posture of the case did not require the supreme court to delineate the coverage of the agreement. However, in rejecting the wife's argument that the agreement applied only in the event of death, the court noted:

The agreement provides, in pertinent part that:

The parties agree after the solemnization of the marriage between the parties, each of them shall *separately retain* all rights in his or her own property, real, personal or mixed, whether now owned or hereafter acquired, and each of them shall have the *absolute and unrestricted right* to dispose of such separate property, *free from any claim that may be made by the other by reason of their marriage, and with the same effect as if no marriage had been consummated between them.*

* * * This clear and unambiguous language operates to govern disposition of the parties' property upon dissolution of their marriage.

295 N.W.2d at 572 (emphasis in original). This broad, unqualified language suggests that the court would enforce the agreement with respect to property acquired during the marriage.

We acknowledge that this antenuptial agreement is governed not by Minn. Stat. § 519.11, but by common law, and concur with the trial court's conclusion that " * * * the intent of an antenuptial contract is to substitute the marrying couple's foresight for the law's essentially retrospective analysis of their marital estate." The provision of antenuptial agreement disposing of marital property is valid and enforceable.

3. Finally, wife urges that the trial court's denial of spousal maintenance was error. Under the terms of the antenuptial agreement, in the event of termination of the marriage relationship " * * * neither party shall be entitled to any alimony * *." The question of whether such a provision is valid is one of first impression in Minnesota. However, other jurisdictions have addressed this issue.

In *Newman v. Newman*, 653 P.2d 728 (Colo.Sup.Ct.1982), the Colorado Supreme Court was requested to rule that maintenance provisions in an antenuptial agreement were void as against public policy. It declined to do so, finding "There is no statutory proscription against contracting for maintenance in an antenuptial agreement." *Id.* at 734. However, the *Newman* court continued:

[S]uch provisions may lose their legal vitality by reason of changing circumstances which render the antenuptial provisions for maintenance to be unconscionable at the time of the marriage dissolution * * *

* * * It is not unrealistic to recognize that the health and employability of the spouse may have so deteriorated during a marriage that to enforce the maintenance provisions of an antenuptial agree-

ment would result in the spouse becoming a public charge. Thus, we do not subscribe to the view that the antenuptial agreement, even though entered into in accordance with the strict tests heretofore alluded to, is strictly enforceable regardless of intervening events which have rendered it in effect unconscionable.

\* \* \* \* \* \*

In our view, unconscionability \* \* \* as applied to a maintenance agreement exists when enforcement of the terms of the agreement results in a spouse having insufficient property to provide for his reasonable needs and who is otherwise unable to support himself through appropriate employment.

*Id.* at 734–35.

The appellate court of New Jersey has also addressed the issues of maintenance provisions in an antenuptial contract. In *Marschall v. Marschall*, 195 N.J.Super. 16, 477 A.2d 833 (1984), although deciding on other grounds, the court observed by way of dicta:

> An [antenuptial] agreement which would leave a spouse a public charge or close to it, or which would provide a standard of living far below that which was enjoyed both before and during the marriage would probably not be enforced by any court.

*Id.* at 30–31, 477 A.2d at 840–841.

Finally, a case recently decided by the Supreme Court of Ohio is especially relevant to the case at bar. In *Gross v. Gross*, 11 Ohio St.3d 99, 464 N.E.2d 500 (1984), the court discussed at length the public policy interests to be considered when determining the validity of an antenuptial agreement, and concluded that such agreements were valid. In addressing the issue of maintenance specifically, the *Gross* court ruled:

> In the review of provisions in antenuptial agreements regarding *maintenance or sustenance* alimony, a further standard of review must be applied—one of conscionability of the provisions at the time of the divorce or separation. \* \* \*

[T]he provisions relating to maintenance or sustenance may lose their validity by reason of changed circumstances which render the provisions unconscionable as to one or the other at the time of the divorce of the parties. Accordingly, such provisions may, upon a review of all of the circumstances, be found to have become voidable at the time of the divorce or dissolution.

We believe that the underlying state interest in the welfare of the divorced spouse, when measured against the rights of the parties to freely contract, weighs in favor of the court's jurisdiction to review, at the time of a subsequent divorce, the terms in an antenuptial agreement providing sustenance alimony for one of the parties. There is sound public policy rationale for not strictly enforcing such a provision which, even though entered into in good faith and reasonable at the time of execution, may have become unreasonable or unconscionable as to its application to the spouse upon divorce. It is a valid interest of the state to mitigate potential harm, hardship, or disadvantage to a spouse which would be occasioned by the breakup of the marriage, and a strict and literal interpretation of the provisions for maintenance of the spouse to be found in these agreements.

*Id.* at 109, 464 N.E.2d at 509 (emphasis in original).

The trial court in the case at bar, writing before the opinions in either *Gross* or *Marschall* were issued, found the rule of *Newman* to have "substantial appeal." That court further stated, "[t]here is no doubt that the Respondent herein meets the specific problem addressed by *Newman*, and " \* \* \* Respondent would be entitled to a significant award of maintenance if the antenuptial agreement was enforcable [sic] as to the property distribution but " \* \* \* unenforcable [sic] on public policy grounds to the maintenance decision." However, the trial court upheld the maintenance provision in the parties' agreement, recognizing that the difficult

issue here presented may require action by an appellate court.

We believe the language of *Newman, Gross* and *Marschall* is not only "appealing," but persuasive. In weighing the public policy interest in the welfare of a spouse against the rights of parties to freely contract, we conclude that there must be reserved to the court at the time of a marriage dissolution the power to review maintenance provisions of an antenuptial agreement to determine the conscionability of those provisions.

Our conclusion that public policy concerns mandate that maintenance provisions in antenuptial agreements be reviewable at the time of a marriage dissolution is buttressed by review of the Minnesota statutory requirements regarding an award of maintenance. Minn.Stat. § 518.552 (1982) provides in part:

> * * * the court may grant a maintenance order for either spouse if it finds that the spouse seeking maintenance: (a) lacks sufficient property, including marital property apportioned to him, to provide for his reasonable needs, especially during a period of training or education, and (b) is unable to adequately support himself after considering all relevant circumstances through appropriate employment or is the custodian of a child whose condition or circumstances make it appropriate that the custodian not be required to seek employment outside the home.

This section makes no mention of antenuptial contracts. In contrast, Minn.Stat. § 518.54, subd. 5 (1982), defining what constitutes "marital property," does exempt property which "is excluded by a valid antenuptial contract." The *Newman* court found this contrast to be important. In comparing Colorado statutory provisions similar to those in Minn.Stat. §§ 518.552 and 518.54, the *Newman* court observed

> Section 113 authorizes a court to divide the marital property, except property excluded by a valid agreement of the parties. On the other hand, section 114 authorizes the court to order maintenance in accordance with the relevant factors therein specified, but this section does not make any exception to exclude valid prior agreements relating to maintenance. * * * We view the absence of an exception in section 114, providing for maintenance, as evidence of a legislative intent not to preclude examination of antenuptial maintenance agreements for conscionability.

*Newman,* 653 P.2d at 735.

■ We conclude that the Minnesota legislature also did not intend to preclude antenuptial maintenance agreements from review for conscionability. Although provisions in an antenuptial agreement regarding maintenance may generally be considered valid, those provisions may lose their validity by reason of changed circumstances which render the provisions unconscionable, and are thereby reviewable by the court at the time of a marriage dissolution.

■ Having determined that antenuptial agreement maintenance provisions are reviewable at the time of dissolution, we must address the question of which party bears the burden of proof in connection with an attack on those provisions. We believe the decision of the *Gross* court to be well-reasoned and persuasive in this respect also.

> One who, by way of a motion for modification, claims the unconscionability of a provision for maintenance within an antenuptial agreement has the burden of showing the unconscionable effect of the provision at the time of divorce or dissolution.

*Gross,* 11 Ohio St.3d at 109, 464 N.E.2d at 509.

■ We find that wife here has met the burden of showing unconscionability of the maintenance provision in this antenuptial contract. Her physical health is poor. She has emotional problems. Even when healthy, her earning ability was not great. She worked in business with her husband during the marriage, but was not otherwise employed outside the home. Given her present physical and emotional condition,

her prognosis is not favorable. It is unlikely she will be able to be fully self-supporting in the foreseeable future, if ever. She is entitled to an award of maintenance. Despite exceedingly comprehensive and detailed findings made by the trial court, we deem it appropriate that this issue be remanded to that court for determination of an award of maintenance in reasonable amount and of reasonable duration.

We recognize, of course, that an award of maintenance may be made only "from the future income or earnings of one spouse for the support and maintenance of the other." Minn.Stat. § 518.54, subd. 3. Therefore, upon remand, we request the trial court to take into account the amount and source of husband's earnings and income as defined in Section 518.54, subd. 3, recognizing that such income is in large measure derived from the ownership and management of husband's substantial non-marital and marital property.

■ 4. On appeal, the husband challenges the retroactive award of temporary child support. Under Minn.Stat. § 518.131 (1982), a court may award "temporary child support for the children of the parties" and any temporary order "may be revoked or modified by the court before the final disposition of the proceeding upon the same grounds and subject to the same requirements as the initial granting of the order." Minn.Stat. § 518.131, subd. 9(b) (1982).

The trial court found that the failure to provide temporary child support was an oversight and ordered $300 per month temporary support retroactive to the date of the wife's application for temporary relief. The court's finding that the omission was an oversight is not clearly erroneous and the amount awarded is reasonable. Therefore, the award of child support must be upheld.

■ 5. The husband also contests the award of $5,000 attorney's fees to allow the wife to pursue this appeal. Although the antenuptial agreement includes a waiver of attorney's fees, we find that the trial court's award was necessary to ensure substantial justice. Had the trial court not awarded attorney's fees for appeal, the wife would have been financially foreclosed from appealing the trial court's decision on the validity and coverage of the agreement. Such difficult and close questions should be decided on the merits, not by the parties' finances.

## DECISION

We affirm the trial court's decision that the Hills' antenuptial agreement is valid and that it governs the disposition of non-marital and marital property. However, we find that it is not binding with regard to spousal maintenance. We remand to the trial court for an award of appropriate spousal maintenance consistent with this opinion. We affirm the decree in all other respects.

Affirmed in part, reversed in part, and remanded.