In re the Marriage of Mary McKEE–
JOHNSON, Petitioner, Respondent,

v.

Lance J. JOHNSON, Appellant.

No. CX–87–2412, C0–88–565.

Court of Appeals of Minnesota.

Oct. 4, 1988.

Review Granted Dec. 1, 1988.

Phillip Gainsley, Susan C. Rhode, Moss & Barnett, Minneapolis, for petitioner, respondent.

Sheryl Ramstad Hvass, Jannette K. Brimmer, Rider, Bennett, Egan & Arundel, Minneapolis, for appellant.

Heard, considered and decided by LANSING, P.J., and LOMMEN and SCHULTZ, JJ.*

## OPINION

LANSING, Judge.

Lance Johnson and Mary McKee–Johnson both seek review of the original judgment and decree of dissolution of Washington County District Court. Both parties moved for a new trial and amended findings, but before a decision was issued Johnson filed a notice of appeal on December 15, 1987. On December 21, 1987, the trial court issued an order amending several findings and conclusions.[1] We affirm the original judgment and remand to permit the trial court's action on attorney fees.

## FACTS

Lance Johnson and Mary McKee–Johnson dissolved their seven-year marriage in 1987. They have one child, Daniel, born May 4, 1982. Prior to marriage, both had established careers. Johnson, now 48, was a self-employed businessman and attorney. McKee–Johnson, now 45, was a Program Director for Inver Hills and Lakewood Community Colleges' associate nursing degree program.

In 1980, Johnson asked his attorney to prepare an antenuptial agreement. The

---

* Acting as judges of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

1. Johnson filed a second appeal on March 10, 1988 in response to the amended judgment, seeking to have the amended judgment vacated because the trial court lacked jurisdiction. The appeals were consolidated by a March 24, 1988 order. Johnson also brought a post-appeal motion to strike a custody study because it was included in respondent's appendix and was filed in the trial court after the notice of appeal. The study and the references to it contained in the brief are stricken.

agreement, executed on June 12, 1980, provided that property acquired and held separately by each party before or during the marriage would remain the property of that party upon the termination of the marriage whether by death or dissolution.

During the marriage, the parties acquired property totaling over $500,000, including retirement plans worth $94,700, partnerships worth $160,000, stocks worth approximately $23,000 and $208,000 in cash. The trial court concluded that the portions of the antenuptial contract which purported to deal with marital property were void and divided the property without reference to the agreement. The court awarded McKee–Johnson 40% of the marital property and Johnson 60%.

The parties disputed custody of Daniel. McKee–Johnson sought sole physical and legal custody and Johnson requested joint physical and legal custody. Using the standards set forth in *Pikula v. Pikula,* 374 N.W.2d 705, 713 (Minn.1985), the court found that McKee–Johnson was the primary parent during the marriage and that it would be in Daniel's best interests that she have physical custody, subject to a visitation schedule allowing Johnson to spend approximately 45% of the year with Daniel. The court found that joint legal custody would be in the best interests of the child.

In determining child support, the trial court found that McKee–Johnson had reasonable monthly living expenses of $4,064. The court further found that Johnson's gross monthly income was $8,480 and his reasonable monthly expenses were $3,990. Based on these income calculations, the court found Johnson's monthly child support obligation would be $799.15 per month and imputed a support obligation of $460 per month to McKee–Johnson based on the 45% visitation schedule. Observing that a direct offset would equal approximately $340, the court reasoned that because McKee–Johnson is primarily responsible for Daniel's care and because Johnson is financially able to provide support, Johnson

should pay McKee–Johnson $500 per month for child support.

The amended findings and conclusions, issued after the appeal, increased Johnson's support obligation from $500 to $1000 per month, increased McKee–Johnson's share of the property division, and awarded McKee–Johnson $7500 in attorney fees. In determining the effect of post-appeal judgments we have held that

[a]n order entered after an appeal is taken is of no effect because jurisdiction shifts from the district court to the Court of Appeals once an appeal is perfected.

*Brzinski v. Frederickson,* 365 N.W.2d 291, 292 (Minn.Ct.App.1985), *citing Gummow v. Gummow,* 356 N.W.2d 426, 428 (Minn.Ct. App.1984). *See also Kath v. Kath,* 238 Minn. 120, 123, 55 N.W.2d 691, 693 (1952); *Evans v. Blesi,* 345 N.W.2d 775, 780 (Minn. Ct.App.1984). Based on these holdings, we consider the original judgment entered on December 15, 1987 as the appropriate judgment for review.[2]

## ISSUES

1. Did the court err in finding McKee–Johnson to be the primary parent of the parties' minor child and in granting her sole physical custody, and in granting both parties joint legal custody?

2. Did the court err in finding that the antenuptial agreement, as it pertains to marital property, is void and unenforceable?

3. If the agreement as to marital property is not enforced, was the trial court's allocation of the marital property an abuse of discretion?

4. Did the court err in its determination of child support?

5. What is the effect of a pending motion for attorney fees when a notice of appeal is filed?

## ANALYSIS

### I. Custody

Recognizing the importance of stability in the life of a child and that the

---

**2.** We observe, however, that a party may avoid the procedural difficulty encountered here by requesting a stay of entry of judgment or making a *timely* motion to this court for remand for entry of the amended judgment.

relationship between a child and his or her primary parent most often provides that stability, there is a presumption that the primary parent should be the child's physical custodian. *Pikula v. Pikula*, 374 N.W. 2d 705, 713 (Minn.1985). Our review of custody determinations is limited to whether the trial court abused its discretion by making findings unsupported by the evidence or by improperly applying the law. *Id.* at 710.

Both parties testified at trial to their care of Daniel and their relationship with him. Based on that testimony, the court found:

[McKee–Johnson] has been the primary caretaker of the parties' child, [she] was primarily involved in the preparation and planning of the child's meals, his bathing, grooming, and dressing; the purchasing, cleaning, and care of his clothes; providing his medical care; arranging for his social interaction among peers; arranging alternative care for him; putting him to bed at night and attending to him during the night; waking him in the morning; disciplining him, educating him, and teaching him elementary skills. [Johnson] has assisted in raising the child, and since the separation of the parties has taken more responsibility for the child's care and well-being. However, during the course of the marriage, [McKee–Johnson] was the primary caretaker.

■ On appeal Johnson asks us to place great emphasis on a narrow window of time in which both parents shared caretaking duties, the time of separation. *Pikula* requires the court to determine the primary caretaker with reference to the time up until the dissolution proceedings, or the separation leading to it. *Cf. Sefkow v. Sefkow*, 427 N.W.2d 203, 212 (Minn.1988) ("only if this date is reasonably close to the actual trial"). McKee–Johnson presented extensive evidence on her care of Daniel. She took a leave from employment for Daniel's first eighteen months, and the record supports the trial court's finding that she remained primarily responsible for Daniel's care. The trial court's granting sole physical custody to McKee–Johnson, premised on her role as primary parent, was not an abuse of discretion.[3]

■ McKee–Johnson argues that the court erred in granting the parties joint legal custody. The trial court found that the parties have demonstrated an ability to cooperate in the rearing of Daniel, and that when they have been unable to reach a consensus on an issue, they have submitted to mediation for resolution. These findings have a basis in the record and support the trial court's grant of joint legal custody to the parties.

## II. Antenuptial agreement

Minnesota recognizes the validity of antenuptial agreements governing property settlements upon dissolution. *Englund v. Englund*, 286 Minn. 227, 230, 175 N.W.2d 461, 463 (1970). Minn.Stat. § 519.11 (1986) codifies the current requirements for a valid antenuptial agreement:

A man and woman of legal age may enter into an antenuptial contract or settlement prior to solemnization of marriage which shall be valid and enforceable if (a) there is a full and fair disclosure of the earnings and property of each party, and (b) the parties have had an opportunity to consult with legal counsel of their own choice. An antenuptial contract or settlement made in conformity with this section may determine what rights each party has in the nonmarital property, * * *, upon dissolution, * * * and may bar each other of all rights in the respective estates not so secured to them by their agreement. This section shall not be construed to make invalid or unenforceable any antenuptial agreement or settlement made and executed in conformity with this section because the agreement or settlement covers or includes marital property, if

---

**3.** Johnson also argues that the visitation schedule fails to conform to the 45% visitation ordered by the trial court. That issue was not raised to the trial court in Johnson's post-trial motion, and is not properly raised for the first time on appeal.

the agreement would be valid and enforceable without regard to this section. Minn.Stat. § 519.11, subd. 1 (1986).

■ This statute governs the procedures by which an antenuptial agreement is executed and presumed valid and enforceable. If an agreement has been entered into in accordance with statutory procedures, an antenuptial agreement may determine what rights each party has in the nonmarital property. McKee–Johnson does not dispute that the antenuptial agreement is enforceable against her nonmarital property.

The question in this case, however, is whether in a dissolution action a party's rights to *marital property* may be barred by an antenuptial agreement. The trial court, relying on Minn.Stat. § 519.11 and *Hill v. Hill*, 356 N.W.2d 49 (Minn.Ct.App. 1984), found that "the provision in the agreement which purports to govern the distribution of marital property is invalid and must be severed from the rest of the agreement."

Whether antenuptial agreements may be used to distribute marital property depends on the interpretation of Minn.Stat. § 519.11. Johnson contends that this statutory enactment deals with procedure and does not affect the validity of antenuptial agreements for marital property which were recognized at common law. *See Hafner v. Hafner*, 295 N.W.2d 567 (Minn.1980); and *Englund v. Englund*, 286 Minn. 227, 175 N.W.2d 461 (1970). McKee–Johnson contends that the effect of § 519.11 is to negate the parties' ability to contract over their marital property. Although the statute does not expressly prohibit antenuptial agreements on marital property, we conclude that the reasonable interpretation of the statute together with its legislative history confirms the trial court's determination that the agreement as it relates to marital property is void.

■ First, we note that subd. 6 states "[t]his section shall apply to *all* antenuptial contracts and settlements executed on or after August 1, 1979." (Emphasis added.) By applying the statute to *all* antenuptial agreements and permitting only the determination of nonmarital rights, the statute, by implication, excludes antenuptial contracts for marital property. We acknowledge that a competing interpretation could be constructed, but we believe that it is strained to argue that the statute applies only to the nonmarital provisions of all antenuptial agreements. We also note that it would be anomalous to impose safeguards on antenuptial contracts for the disposition of nonmarital property, yet leave unregulated contracts for the disposition of marital property, in which the rights of a spouse are much greater. *See* Minn.Stat. § 518.54, subd. 5.[4]

Legislative history compels this construction. In discussions before the Senate Judiciary Committee at its March 27, 1979 meeting, the committee considered the proposed bill on antenuptial agreements, as it passed from the House. The bill at that point permitted antenuptial contracts to dispose of both marital and nonmarital property. The following discussion took place:

MR. DIETRICH: I would just like to raise the question of marital property acquired after the marriage. I wonder why we should allow, do you know why the House added that, why they want to allow a reference to property they don't have?

\*　　\*　　\*　　\*　　\*　　\*

I suppose you could take the position people ought to be able to contract any way they want.

MR. CHAIRMAN: Senator Sieloff, I guess the thing that bothers me about the bill is I'm not sure how you make full and fair disclosure of all the property you don't have; that isn't in existence yet.

\*　　\*　　\*　　\*　　\*　　\*

4. Although Minn.Stat. § 518.54, subd. 5(e) categorizes as nonmarital any property excluded by a valid antenuptial contract, the existence of that section, enacted in 1978, is not sufficient to compel a definition contrary to the language and legislative history of Minn.Stat. ch. 519. *See* 1978 Minn. Laws ch. 772, § 48, subd. 5.

MR. SIELOFF: My feeling is I deliberately, when I drafted the bill, I made it a conservative bill. I only put in premarital property * * *.

Further, the evolution of the bill reflects the removal of *marital property* from contractable rights. The first engrossment stated:

An antenuptial contract or settlement made in conformity with this section may determine what rights each party has *in the marital and nonmarital property* * * *.

(Emphasis added.) This language stayed in the bill through the third engrossment. In the fourth engrossment, and in the statute, as codified, this part of the statute states:

An antenuptial contract or settlement made in conformity with this section may determine what rights each party has in the *nonmarital property* * * *.

Minn.Stat. § 519.11, subd. 1 (1986) (emphasis added). The legislature's decision to omit marital property from bargainable property rights is clear when the evolution of the bill is examined.

Johnson argues that the final sentence of § 519.11, subd. 1, is inconsistent with an interpretation prohibiting antenuptial agreements on marital property. That sentence states:

This section shall not be construed to make invalid or unenforceable any antenuptial agreement or settlement made and executed in conformity with this section because the agreement or settlement covers or includes marital property, if the agreement or settlement would be valid and enforceable without regard to this section.

Minn.Stat. § 519.11, subd. 1 (1986).

 We conclude that this sentence acts as a savings clause to make combination agreements severable and preserve the validity of nonmarital property provisions even though the marital property divisions are void. Otherwise, the statute becomes contradictory. Although we recognize that statutes derogating the common law should be strictly construed, we also recognize that the primary object of the interpretation of any statute is to ascertain, if possible, and to give effect to the intention of the legislature that enacted the law. As the United States Supreme Court has observed,

The rule that statutes in derogation of the common law are to be strictly construed does not require such an adherence to the letter as would defeat an obvious legislative purpose or lessen the scope plainly intended to be given to the measure.

*Jamison v. Encarnacion,* 281 U.S. 635, 640, 50 S.Ct. 440, 442, 74 L.Ed. 1082 (1930).

This interpretation also comports with our decision in *Hill.* Although the issue was not directly presented in *Hill,* it is the only reported Minnesota case which discusses a marital property antenuptial agreement following enactment of Minn. Stat. § 519.11 (1982). In that case, we stated that agreements

attempting to cover both marital and nonmarital property rights must be severed, with effect being given only to provisions dealing with nonmarital property. However, Section 519.11 was enacted five years after the parties signed this antenuptial contract and does not govern this case.

*Hill,* 356 N.W.2d at 54.

Finally, we note that the trial court's findings on the formation of the contract, based on evidence in the record, suggest unconscionability which could independently invalidate the agreement.

### III. Property division

 The trial court is required to make a "just and equitable" division of the marital property. Minn.Stat. § 518.58 (1986). The division need not be equal in order to be equitable. *Ruzic v. Ruzic,* 281 N.W.2d 502, 505 (Minn.1979). When dividing property from a marriage, the trial court has broad discretion, *Schmitz v. Schmitz,* 309 N.W.2d 748, 750 (Minn.1981), and will be reversed only on a clear showing of abuse of discretion. *Bogen v. Bogen,* 261 N.W.2d 606, 609 (Minn.1977).

 The trial court found that the total amount of property acquired after the parties' marriage consisted of $208,000 cash

and $306,397 in real estate or other tangible assets. In the original judgment, the trial court awarded McKee–Johnson 40% of this amount, $205,800 in cash, to be paid in two equal amounts. Awarding Johnson the greater amount, 60%, the court recognized "Mr. Johnson's expertise in increasing the parties' wealth." This division is factually based and not inequitable. Johnson's claim that the cash payment would require him either to liquidate assets or pay from his nonmarital assets was not raised to the trial court, and the record does not support his allegations. The court did not abuse its discretion in its property settlement.

### IV. Child support determination

The trial court has broad discretion in determining child support, and the scope of review of child support obligations is narrow. If the trial court's determination has a reasonable and acceptable basis in fact and principle, the reviewing court "will and must affirm" the trial court. *DuBois v. DuBois*, 335 N.W.2d 503, 507 (Minn. 1983).

In the original judgment and decree, the trial court found that the parties' standard of living prior to separation was very high, and that the child had no financial resources other than those of his parents. Based on these findings, the court ordered Johnson to pay $500 per month for child support.

Johnson argues that the interest income from $400,000 in certificates of deposit was improperly included in the calculation of net income because at least two of these will be converted to cash to pay McKee–Johnson the property settlement. He also argues that the trial court erroneously disregarded two of his significant debts in calculating his net income available for child support. Johnson did not present testimony at trial verifying these debts. The record indicates that no monthly payments were due on either of the debts at issue, and that both debts were taken into consideration in determining Johnson's assets, liabilities, and income. It also appears that Johnson has adequate

assets to meet the payments required of him. The trial court's reasons are not arbitrary. We affirm the original judgment and decree.

### V. Attorney fees

The court's award of attorney fees is not effective because it was made following the filing of appellant's notice of appeal. However, McKee–Johnson requested fees prior to Johnson's notice of appeal. The motion was pending before the trial court and it should be allowed to award fees within its discretion. Accordingly, we remand the issue of attorney fees to the trial court.

### DECISION
AFFIRMED AND REMANDED IN PART.