In the Matter of the ESTATE OF James J. SERBUS, Sr., Deceased.

**John F. SERBUS, Personal Representative of the Estate of James J. Serbus, Sr., Deceased, petitioner, Appellant,**

v.

**Mary SERBUS, Respondent.**

No. 51799.

Supreme Court of Minnesota.

Oct. 1, 1982.

Joseph W. Parris, and Donald W. Fett, Parris Law Offices, Hector, for appellant.

Hulstrand, Anderson, Larson & Boylan and Ronald C. Anderson, Willmar, for respondent.

WAHL, Justice.

This appeal arises out of respondent Mary Serbus' objection to the probate of the will of her husband, James J. Serbus. Mary Serbus seeks to set aside an antenuptial agreement between James and herself and to revoke her consent to James' will. The Probate Division of Renville County Court ruled in Mary's favor. John F. Serbus, son of James and personal representative of his estate, appealed the trial court's decision to a three-judge panel of the Eighth Judicial District, which upheld the trial court in a 2–1 decision. We granted discretionary review and now reverse.

Mary and James Serbus were married on April 17, 1963, when she was 65 and he was 68. Each had been married before, and each had five children. On March 28, 1963, about 3 weeks before their wedding, Mary and James executed an antenuptial agreement in which Mary consented to James' making of a will which would provide her at his death with $4,000, a life estate in the homestead and its furnishings, and a funeral similar in nature and quality to his own. Immediately after their wedding a few weeks later, James executed a will incorporating the terms to which Mary had agreed, and Mary executed a consent to the will.

Fifteen years later, on December 8, 1978, James suffered a fall and was confined to a nursing home. His children and Mary became involved in a dispute over his guardianship. On March 16, 1979, Mary executed a revocation of her consent to her husband's will. James died on June 10, 1979, and Mary executed a renunciation of his will on June 14, 1979. The validity of the antenuptial agreement revocation is at issue in this appeal.

James accumulated substantial assets prior to his marriage to Mary. Upon his retirement from farming in 1955, he gave each of his three sons a separate 80-acre tract of land to farm. He retained another 400 acres which were to pass to his children under the terms of the will. At the time of James' death, his estate was worth over $900,000: approximately $735,000 in real property and about $200,000 in cash and other personal property. The trial court found that, at the time of his marriage to Mary, James had cash assets of approximately $58,000 and real estate valued at approximately $90,000. At no time has Mary had independent assets of any significant value.

James' will describes and devises to James' five children four farms owned by James. The will also contains a residual clause under which all of James' personal property, except that specifically bequeathed to Mary, would pass to James' children. The will, which was signed by James and witnessed by attorney Leigh Ronning and his secretary, Ruth Bredeson, is followed by Mary's written consent. The consent provides:

I, Mary Serbus, wife of James J. Serbus, Sr., do hereby declare that I know the contents of the foregoing will and that I am familiar with the nature and extent of the estate of James J. Serbus, Sr. and I do hereby consent to said will and agree to take the bequest therein provided for me in lieu of any statutory right which I may have to make selection or receive inheritance other than the bequest contained in said will.

At the probate proceedings, however, Mary testified that, when she signed the antenuptial agreement and consent to the will, she did not know how much property James owned. She stated that she knew James had land but that he had never told her how much land or money he had. She said that she had not read the antenuptial contract and consent to the will before signing them, that she had not participated with James and Ronning in any discussion about the property, and that, when the documents were ready for her signature, Ronning had simply told her to sign them.

Ronning denied Mary's testimony. He stated that it was his standard practice to describe to a person in Mary's situation her statutory inheritance rights. Ronning admitted, however, that he considered James his client, that he did not advise Mary to seek other counsel, and that he himself did not discuss with Mary the nature and extent of James' property.

Mary testified that she first learned the extent of James' property and the terms of his will when, about a year after their marriage, the two of them went over the will together. At that time, she told her husband she would have difficulty living on $4,000. However, 15 years later, at James' guardianship hearing on May 17, 1979, Mary gave this testimony:

Question: Okay, Mrs. Serbus, do you have in your possession Mr. Serbus' will?

Answer: Yes.

Question: Have you ever made a statement to anyone that because the Will did not favor you, that you were going to destroy it?

Answer: No, I was satisfied with the Will.

In the intervening years Mary took no steps to revoke either the antenuptial contract or her consent to James' will.

James' children testified that Mary was aware of the extent of their father's wealth. Martha Tauer, a daughter, stated that he had mentioned having $100,000 or more and willing Mary $4,000. According to Tauer, these statements were made in Mary's presence before she married James. Rita Schoepfer, another daughter, testified that she had heard James tell Mary how much money he had but that she could not remember the exact amount. Rita also stated, as did several of James' children, that James often bragged about his money and that his wealth was a matter of general knowledge in the community. James' sons, Lloyd, James, Jr., and John, each gave similar testimony. Lloyd stated that James discussed his worth in Mary's presence. James, Jr. testified that James had told Mary he had approximately $100,000 and 400 acres of land. He also indicated that Mary had expressed satisfaction with what she would be getting at her husband's death. John stated that his father had mentioned the $100,000 figure in Mary's presence.

Under the terms of the antenuptial contract, Mary agreed to accept, in lieu of her statutory rights, the sum of $4,000, a life interest in the homestead and its furnishings, and a funeral equal in nature and quality to that of her husband. James' will incorporates the terms of the antenuptial contract and passes the bulk of his property to his children. The trial court found that James had a duty to disclose to Mary the extent of his property and that the personal representative of the estate had not sustained the burden of showing that such disclosure had been made. Therefore, the trial court invalidated both Mary's consent and the antenuptial agreement and allowed Mary to take against the will.

Parties to a marriage have long been able to enter into enforceable antenuptial contracts. *Appleby v. Appelby,* 100 Minn. 408, 111 N.W. 305 (1907). Seventy years ago, in an effort to recognize the validity of such contracts while at the same time protecting the equally strong policy of encouraging trust in confidential relationships, we determined that a presumption of fraud is raised when parties to an antenuptial contract stand in a confidential relationship to one another and there is inadequate consideration to support their agreement. *Slingerland v. Slingerland,* 115 Minn. 270, 132 N.W. 326 (1911).

The trial court found that a confidential relationship existed between Mary and James when they executed their antenuptial contract. This finding is reasonably supported by the record as a whole. First, James did not need a housekeeper. His daughter, Rita, lived with and cared for him until he married Mary. Second, James courted Mary. He took her to family gatherings and dances before they were married. They "kept company." James was a "nice man" whom Mary loved and trusted. The trial court could conclude from this evidence that James was seeking Mary's companionship and that the marriage was not simply a business arrangement.[1] We

---

1. We contrast this case with *In re Estate of Malchow,* 143 Minn. 53, 172 N.W. 915 (1919), where we found no confidential relationship.

In *Malchow,* the parties, strangers to one another, talked of marriage at their first meeting. There was no courtship or engagement, and it was clear that Malchow wanted a housekeeper.

give due deference to the trial court's opportunity to judge the credibility of the witnesses and will not set aside such a finding of fact made by the trial court without a jury unless clearly erroneous. Minn.R.Civ.P. 52.01; *Northern States Power Co. v. Lyon Food Products,* 304 Minn. 196, 201, 229 N.W.2d 521, 524 (1975).

█ The trial court next found, and John Serbus does not dispute, that, under the terms of the antenuptial contract, Mary receives far less than she would be entitled to if she were permitted to take against the will or if no will were in existence. Under those circumstances, Mary would take approximately one-third of James' real and personal property, or about $300,000. Under the antenuptial contract, she receives the sum of $4,000 and a life estate in the homestead and its furnishings. The consideration for the antenuptial contract was clearly inadequate.

Thus, there is a presumption of fraud under *Slingerland.* In such a situation at common law, the burden rested upon the party who retained the greater interest "to show there was no fraud or concealment, and that [the other party] knew the extent, character, and value of his property and the nature and extent of her rights as his wife and widow." *Slingerland,* 115 Minn. at 275, 132 N.W. at 328.

█ In 1978, the Minnesota legislature codified the major requirements of the common law of antenuptial contracts:

A man and woman of legal age may enter into an antenuptial contract or settlement prior to solemnization of marriage which shall be valid and enforceable if (a) there is a full and fair disclosure of the earnings and property of each party, and (b) the parties have had an opportunity to consult with legal counsel of their own choice.

Minn.Stat. § 519.11, subd. 1 (1980). The statute, which does not pertain to the case at bar, further provides that "[a]n antenuptial contract or settlement duly acknowledged and attested shall be prima facie proof of the matters acknowledged therein and as to those matters, the burden of proof shall be and rest upon the person contesting the same." Minn.Stat. § 519.11, subd. 5 (1980). The statute thus places the burden of proof on the person contesting "the matters acknowledged therein."

The antenuptial contract at issue here, written in 1963, is governed not by the statute but by our cases under the common law. At common law, the burden of proving full disclosure of assets and knowledge of right to independent legal counsel rests with the proponent of the antenuptial contract, John Serbus in this case. *Gartner v. Gartner,* 246 Minn. 319, 323, 74 N.W.2d 809, 813 (1956); *Slingerland v. Slingerland,* 115 Minn. 270, 132 N.W. 326. The reason for such a rule is that persons entering into such a contract are in a fiduciary relationship. The party giving up an interest is placing trust in the other party and expecting him or her not to abuse that trust. Since it would be easy for the person retaining the greater interest to abuse the trust placed in him, we require that person to prove he has provided the other with full and fair information before entering into the antenuptial contract. *In re Estate of Malchow,* 143 Minn. at 58, 172 N.W. at 916.

█ Did John Serbus sustain his burden of showing that Mary knew the extent of James' property at the time she signed the antenuptial contract? We believe that he did. We evaluate the trial court's finding to the contrary under the rule set out in *Northern States Power Co. v. Lyon Food Products,* 304 Minn. at 201, 229 N.W.2d at 524. We will not disturb a trial court's findings of fact on review "unless they are clearly erroneous in the sense that they are manifestly contrary to the weight of the evidence or not reasonably supported by the evidence as a whole." *Id.* (citation omitted). On this issue, it is not just a question of the credibility of the witnesses. There is written evidence in both the antenuptial contract and the consent to the will that Mary knew the extent of James' property.

These written statements render the credibility of Mary's testimony to the contrary extremely doubtful. We find that the trial court's findings must be set aside as contrary to the weight of the evidence.

There is support in the oral testimony, as well as in the written evidence, that Mary knew the extent of James' property. Mary herself, 16 years after her marriage to James, stated in open court at the guardianship proceeding on May 17, 1979, that she was satisfied with the terms of the will. Attorney Ronning, who had no interest in the outcome of the matter, testified that Mary had read the documents and that her legal rights had been explained to her. James was a person who talked freely about his property. While it is true that James was in a position to take advantage of Mary's trust in him, we find that the evidence supports an opposite conclusion.

Under both *Slingerland* and Minn.Stat. § 519.11, subd. 1, each party to an antenuptial contract must also have an opportunity to consult with an attorney. The unusual fact in this case is that, while Ronning did not suggest that Mary seek independent counsel, it was Mary who chose Ronning as an attorney. Ronning had been an acquaintance of Mary's former husband, Emil Olson, had visited the Olson home on several occasions and had probated Olson's estate. Under these unusual facts, we find that Mary's rights were adequately protected. We do not, however, underestimate the importance of independent legal counsel, especially in cases where it is not clear on the record that the party giving up an interest was advised of the nature and extent of the other's property.

We hold that John Serbus sustained his burden of showing that, at the time of signing the antenuptial contract and consent to the will, Mary Serbus knew the extent of James Serbus' property and the nature of her interest therein. We reverse the district court appeal panel decision to the contrary.

Reversed.

COYNE, J., took no part in the consideration or decision of this case.