In re the ESTATE OF Howard
C. KINNEY, Deceased.

No. A05–1794.

Supreme Court of Minnesota.

June 14, 2007.

Mary R. Vasaly, Dawn C. Van Tassel, Maslon Edelman Borman & Brand, LLP, Minneapolis, MN, for Appellant.

David Adler–Rephan, North Oaks, MN, for Respondent.

## OPINION

GILDEA, Justice.

James H. Kinney (James), as personal representative of the estate of Howard C. Kinney (Howard), appeals from the district court's order on summary judgment that the antenuptial agreement between decedent Howard and Lillian Kinney (Lillian) is invalid. James argues that the court incorrectly concluded that an "opportunity to consult with independent counsel" requirement exists under common law, and the court therefore erred when it invalidated the antenuptial agreement. The court of appeals affirmed. *In re Estate of Kinney*, No. A05–1794, 2006 WL 1806386

(Minn.App. July 3, 2006). We granted James's petition for review and reverse and remand to the district court for further proceedings. We hold that although the opportunity to consult with independent counsel about an antenuptial agreement is a relevant factor in determining whether the agreement is enforceable under common law, it is not required for the antenuptial agreement to be enforceable.

Howard's first wife, Mary Kinney (Mary), died in 1967, leaving an estate to Howard and the couple's three children. Howard received a one-third interest in farm property in Illinois and Indiana, and the children shared the remaining two-thirds interest in the property. After he began dating Lillian, Howard asked his children for a life estate in their two-thirds interest in the farm property. The children agreed, and in exchange, Howard agreed to draft a will giving his children everything he had received from Mary. Additionally, Howard told his children that if he ever remarried he would have a strong antenuptial agreement that would leave everything he had to them.

Howard and Lillian were married on August 29, 1969, when Lillian was 45 years old and Howard was 55 years old. At that time, Lillian was employed at the Prudential Insurance Company, and had been so employed since 1944. She was promoted to assistant manager in 1949 and then to manager in 1954. As manager, Lillian's job duties included hiring and training new employees, taking payments from customers and balancing accounts, and occasionally drafting letters to clients. She had also taken classes at the College of St. Catherine before her marriage to Howard.

The morning of their wedding, Howard drove to Lillian's apartment, picked her up, and took her to St. Paul. According to Lillian, Howard said he was taking her downtown to "sign some papers" at Howard's attorney's office.[1] Because Howard is deceased and the attorney who drafted the antenuptial agreement cannot be located, only Lillian and the agreement itself provide evidence as to what happened during the August 29 meeting.

James contends that Lillian knew about the antenuptial agreement "quite a ways" before the day of the wedding. The district court found that "[t]he evidence tends to show that Lillian Kinney discussed the general terms of the antenuptial contract with the decedent prior to the wedding." The court also found, however, that "[t]here is no evidence to rebut Lillian Kinney's deposition that the first time she saw the written antenuptial contract was on the day of her wedding."

In her deposition testimony, Lillian testified that she read through the antenuptial agreement completely. A clause in the agreement states that "Lillian M. Seiler acknowledges * * * that she has given due consideration to [Howard's net worth] and has conferred with her family as to same, and that she is entering into this agreement freely and with a full understanding of its provisions." Lillian testified in her deposition, however, that she "didn't understand all of [the agreement]." In her Deposition Correction Sheet, Lillian stated that she "did not understand the following legal terms: dower, statutory allowance in lieu of dower, distributive share, right of election against a Will, descent of homestead, widow's support or other widow's allowances."

Lillian also testified in her deposition that she felt she was under duress because the agreement was presented to her on the day of her wedding, when she was "flustered" and "had other things on [her]

---

1. The "papers" were the antenuptial agreement that is the subject of this litigation.

mind." Lillian stated, however, that she did not feel threatened, that Howard never insisted that Lillian "must" sign the agreement, and that Howard never said "Sign this or I'm not marrying you." Instead, she indicated that Howard said that he "need[ed]" her to sign the agreement. In her Deposition Correction Sheet, Lillian said that she "believed that in order * * * to get married [she] had to sign the document."

Additionally, Lillian stated in her responses to interrogatories that on August 29, 1969, she was never asked if she wanted an attorney, she "never thought about consulting with an attorney," and neither Howard nor his attorney suggested that she should consult with an attorney. She also stated that she "would not have known who to consult with even if [she] had thought of doing so."

Lillian signed the antenuptial agreement at the August 29, 1969, meeting. In addition to the clause indicating that Lillian entered into the agreement "freely and with a full understanding of its provisions," the agreement includes the following provisions:

> WHEREAS, Lillian M. Seiler has agreed to accept the provisions of this agreement in lieu of all marital rights in the property now owned or hereafter acquired by Howard C. Kinney, or in his estate upon his demise, which she would otherwise acquire as the surviving spouse of Howard C. Kinney, and whereas, Howard C. Kinney has agreed

that he will take nothing from the estate of Lillian M. Seiler.

IT IS THEREFORE AGREED:

> 1. Lillian M. Seiler hereby waives and releases all rights including, but not limited to, dower, statutory allowances in lieu of dower, distributive share, right of election against a will, descent of homestead, widow's support or other widow's allowances, or otherwise, which she may acquire by reason of her marriage to Howard C. Kinney in any property owned by him at the time, or by his estate upon his death.

In another clause in the agreement, Howard agreed to obtain an endorsement to name Lillian the sole beneficiary of a $10,000 life insurance policy.[2] The agreement was reciprocal in the sense that Howard also agreed to give up any rights he would have as surviving spouse to Lillian's "property and estate."

Lillian and Howard were married 34 years until Howard's death in 2004. James was appointed executor of the estate. Thereafter, Lillian filed petitions to allow for selection of personal property, for family maintenance, for election of homestead rights, and for an elective share of Howard's augmented estate pursuant to Minn.Stat. § 524.2–202(a) (2006).[3] James responded by filing a petition for enforcement of the antenuptial agreement, two petitions for the sale of real property that Howard owned in St. Paul, Minnesota,[4] and petitions objecting to Lillian's petitions. The district court ordered a sepa-

---

**2.** This policy was worth about $70,000 at the time of Howard's death.

**3.** Based on the length of their marriage, Lillian's share under the statute is 50 percent of the estate. *See* Minn.Stat. § 524.2–202(a) ("The surviving spouse of a decedent who dies domiciled in this state has a right of election, * * * to take an elective-share amount * * * determined by the length of

time the spouse and the decedent were married to each other * * *.").

**4.** The district court granted one of the petitions for the sale of the real property that Howard owned in St. Paul. It does not appear, however, that the court took any action on the other petition, relating to the homestead property.

rate trial on the petition for enforcement of the antenuptial agreement, noting that the "issue is dispositive of the action, and may limit or remove the need for a trial of the other petitions filed in this action."

The parties filed cross-motions for summary judgment. The district court, on the recommendation of a probate court referee, concluded that the antenuptial agreement is governed by common law and that James, as the proponent of the antenuptial agreement, had the burden "to prove full disclosure of assets and knowledge of right to independent legal counsel." The court then found that Lillian "had sufficient knowledge of the extent of decedent's assets prior to signing" the agreement, and that there was sufficient consideration for the agreement. The court found, however, that Lillian was not provided with the opportunity to consult with independent legal counsel before signing the agreement, and therefore concluded that "[d]ue to the lack of knowledge of the right to consult with independent legal counsel," the antenuptial agreement was invalid. The district court therefore granted Lillian's motion for summary judgment. The court of appeals affirmed, concluding that "[t]he district court correctly applied the law as it existed at the time the antenuptial agreement was executed." *Kinney*, 2006 WL 1806386, at *3.

## I.

■ When reviewing a district court's decision to grant summary judgment, we determine whether there are any genuine issues of material fact and whether the district court erred in its application of the law. *Isles Wellness, Inc. v. Progressive N. Ins. Co.*, 703 N.W.2d 513, 516 (Minn.2005). We view the evidence in the light most favorable to the party against whom judgment was granted. *Id.*

Because the antenuptial agreement between Howard and Lillian was executed in 1969, the agreement is governed by common law rather than by Minn.Stat. § 519.11, subd. 6 (2006) (stating that the statute "shall apply to all antenuptial contracts and settlements executed on or after August 1, 1979").[5] The issue presented in this case is whether, in order to conclude that an antenuptial agreement is valid under common law, a court must find that each party to the agreement had the opportunity to consult with independent counsel.[6]

■ Under common law, we analyze antenuptial agreements to determine whether they are "equitably and fairly made." *See Gartner v. Gartner*, 246 Minn. 319, 323, 74 N.W.2d 809, 812–13 (1956). Our common law cases indicate that we examine a number of factors in making this determination.

For instance, in *Slingerland v. Slingerland*, we addressed three questions: (1) whether the agreement was the product of fraud, undue influence, or duress; (2) whether the consideration was adequate; and (3) whether the spouse challenging the agreement knew "the extent, character,

---

**5.** Minnesota Statutes § 519.11, subd. 1 (2006), states that "an antenuptial contract * * * shall be valid and enforceable if (a) there is a full and fair disclosure of the earnings and property of each party, and (b) the parties have had an opportunity to consult with legal counsel of their own choice."

**6.** The district court used the phrases "opportunity to consult with independent legal coun-

sel" and "knowledge of the right to consult with independent legal counsel." Lillian also sometimes refers to "knowledge of the right to independent counsel." For the sake of consistency, we refer collectively to the opportunity to consult with independent legal counsel and knowledge of the right to independent counsel as "the opportunity to consult with independent counsel."

and value of [her husband's] property and the nature and extent of her rights as his wife and widow." 115 Minn. 270, 273–75, 132 N.W. 326, 327–28 (1911). We concluded that the antenuptial agreement at issue in *Slingerland* was unenforceable and that "the contract was not her own free act, but in reality the act of defendant done by her pursuant to his will." *Id.* at 274, 132 N.W. at 328. We reached that conclusion after considering a number of factors. We noted that the husband was a "wealthy and successful man of mature years," in comparison to his wife, who was "a young girl" who had become pregnant as a result of "illicit relations" with him. *Id.* at 274, 132 N.W. at 328. We also noted that the wife "kn[ew] he [was] rich, but [did] not know the extent of his wealth." *Id.* at 274, 132 N.W. at 328. We further noted that while the husband had personal counsel who informed the wife that she was giving up her rights in the husband's estate, the wife had "no lawyer or friend to advise her" and she was "not informed as to the nature or extent of the rights she surrender[ed]." *Id.* at 274, 132 N.W. at 328.

In *Welsh v. Welsh*, 150 Minn. 23, 184 N.W. 38 (1921), we said that antenuptial agreements "are to be sustained if they are free from fraud, violative of no statute, are equitably and fairly made and are fair and reasonable in their terms." *Id.* at 25, 184 N.W. at 38. We concluded that the antenuptial agreement in *Welsh* was invalid after consideration of "all the[ ] facts," including the wife's general knowledge of the amount of property the husband possessed, the "entire absence of finding that [the wife] was at all advised as to the nature and extent of her rights as his wife and widow," and the husband's failure to make any provision for his spouse. *Id.* at 25–26, 184 N.W. at 39.

In *Stanger v. Stanger*, 152 Minn. 489, 189 N.W. 402 (1922), we considered wheth-er there was a confidential relationship between the parties, whether there was full and fair disclosure, and whether the wife understood her rights. *Id.* at 491, 189 N.W. at 402–03. We noted the following facts:

> Nothing was said to the plaintiff about her legal rights in his property in the event of marriage. She claims that she thought she was to have title to the homestead property. She had no counsel. The plaintiff came from Germany when she was 18, and speaks English indifferently. She is without business experience. She was not a match for her husband in making such an agreement, and, as before said, had no counsel while he had.

*Id.* at 491, 189 N.W. at 402–03. We concluded "that the question was one of fact for the trial court * * * whether the contract was equitably and fairly made," and, in light of the facts mentioned above, we affirmed the trial court's decision in favor of the spouse challenging the agreement. *Id.* at 491, 189 N.W. at 403.

In *Gartner*, we concluded that the evidence supported the district court's findings that the spouse challenging the agreement knew the extent and nature of her husband's property, and that she "was fully informed as to what her rights would be as a widow and as to the nature and effect of the antenuptial agreement with respect to those rights." 246 Minn. at 325, 74 N.W.2d at 814. In reaching that conclusion, we noted that after the husband had initially consulted with an attorney, both the husband and the wife went to the attorney's office where the attorney discussed the parties' respective property rights and read a draft of the antenuptial agreement to them. *Id.* at 325, 74 N.W.2d at 814. We also noted that the spouse challenging the agreement "was told by the attorney what her rights would be as a

widow absent the agreement." *Id.* at 325, 74 N.W.2d at 814. We further noted that the spouse challenging the agreement "was not entirely inexperienced because some years before she had helped probate her first husband's estate." *Id.* at 325–26, 74 N.W.2d at 814.

In *In re Estate of Jeurissen,* 281 Minn. 240, 161 N.W.2d 324 (1968), we cited *Gartner* for the proposition that an antenuptial agreement should be enforced whenever it is equitably and fairly made. *Jeurissen,* 281 Minn. at 243, 161 N.W.2d at 325. We held that, in spite of the wife's evidence that she did not fully understand the effect of the antenuptial agreement, the agreement was valid because the wife was "a reasonably intelligent and experienced person even though her formal education was not extensive" and because "she probably recognized and respected a disposition on the part of her husband, 67 at the time of the marriage, to preserve the bulk of his estate for [his children]." *Id.* at 244, 161 N.W.2d at 326. In so holding, we noted that the husband had consulted with an attorney, and that both parties appeared at the attorney's office where "they discussed the property held by each, the nature of the rights of each in the property of the other in the event of marriage, and the terms of a proposed antenuptial agreement." 281 Minn. at 242, 161 N.W.2d at 325.

And, in *Hafner v. Hafner,* 295 N.W.2d 567 (Minn.1980), we said that antenuptial agreements are "uniformly sustained when free from fraud or not expressly prohibited by some statute." *Id.* at 571 (quotation marks omitted). We upheld the validity of an antenuptial agreement after stating that "although appellant was not told of her rights in the absence of an antenuptial contract, she was aware of, and freely and voluntarily acceded to, respondent's desire to leave his property to his children," and that "the record discloses that appellant was a reasonably intelligent and experienced individual, even though she [had] a limited formal education." *Id.* at 571–72.

These cases demonstrate that under common law, when a confidential or fiduciary relationship between the parties exists,[7] courts should determine whether the antenuptial agreement was "equitably and fairly made" by considering (1) whether there was fair and full disclosure of the parties' assets; (2) whether the agreement was supported by adequate consideration; (3) whether both parties had knowledge of the material particulars of the agreement and of how those provisions impacted the parties' rights in the absence of the agreement; and (4) whether the agreement was procured by an abuse of fiduciary relations, undue influence, or duress. As the foregoing cases illustrate, the opportunity to consult with independent counsel is a relevant factor in the analysis. But in our review of the common law cases we find no indication that such an opportunity is a *requirement* for a valid antenuptial agreement under common law.

Lillian cites two cases in support of the court of appeals holding that there is such a requirement: *In re Estate of Serbus,* 324 N.W.2d 381 (Minn.1982), and *McKee–Johnson v. Johnson,* 444 N.W.2d 259 (Minn.1989). Both of these cases were

---

7. A confidential or fiduciary relationship between the parties to an antenuptial agreement is usually presumed. *See, e.g., In re Malchow's Estate,* 143 Minn. 53, 59, 172 N.W. 915, 917 (1919). *But see Malchow,* 143 Minn. at 59, 172 N.W. at 917 (concluding that there was *no* confidential relationship because the marriage was "of convenience" and "of a purely business character," Malchow and his wife were "comparative strangers," and Malchow only "wanted a housekeeper"). The parties in this case have not contested that there was a confidential relationship between Lillian and Howard.

decided after Minn.Stat. § 519.11 was enacted, and we acknowledge that there is language in each case that could be read to support Lillian's argument.

For example, in *Serbus,* we said that "[a]t common law, the burden of proving full disclosure of assets *and knowledge of right to independent legal counsel* rests with the proponent of the antenuptial contract." 324 N.W.2d at 385 (emphasis added). We based this statement on two grounds. First, we said that Minn.Stat. § 519.11, which requires "the parties [to] have had an opportunity to consult with legal counsel of their own choice," was a codification of the common law requirements for a valid antenuptial agreement. We did not trace or explain the common law basis for such a requirement, and as our review of the cases above illustrates, there was no such requirement established by our cases. Second, we said that "[u]nder both *Slingerland* and Minn.Stat. § 519.11, subd. 1, each party to an antenuptial contract must * * * have an opportunity to consult with an attorney." *Serbus,* 324 N.W.2d at 386. Although we noted in *Slingerland* that there was no "lawyer or friend" to advise the challenging spouse, that was but one of several factors we considered in concluding the agreement was not equitable and fair. 115 Minn. at 274–75, 132 N.W. at 328.

In *McKee–Johnson,* we cited *Serbus* for the proposition that "[u]nder the common law, the proponent of the agreement had the burden of demonstrating the procedural fairness of the agreement at its inception." *McKee–Johnson,* 444 N.W.2d at 265. And we noted that "*implicit* in the procedural fairness analysis is the requirement that each party to an antenuptial contract has unrestrained access to advice from independent counsel." *Id.* at 266 (emphasis added). *Serbus* was the only

legal authority cited in support of these statements.

We conclude that *McKee–Johnson* and *Serbus* do not dictate the outcome of this case. *McKee–Johnson* was a case in which the antenuptial agreement at issue was governed by Minn.Stat. § 519.11. *McKee–Johnson,* 444 N.W.2d at 262–63. But we looked to common law "to determine whether the provisions of th[e] [antenuptial] contract relating to 'after acquired' property are valid and enforceable." *Id.* at 265. We concluded that the agreement was procedurally fair because there was adequate disclosure and because the party challenging the agreement had waived her right to "unrestrained access to advice from independent counsel." *Id.* at 265–66. In *Serbus* we concluded that the spouse challenging the agreement knew the extent of her husband's property and that she had the opportunity to consult with independent counsel because she chose the attorney who drafted the agreement for both parties. 324 N.W.2d at 386. Thus, we were not presented in either *McKee–Johnson* or *Serbus* with the issue presented here—whether an antenuptial agreement governed by common law is per se invalid if one of the parties did not have an opportunity to consult with independent counsel.

As discussed above, however, while the opportunity to consult with independent counsel has often been a relevant factor that courts considered when assessing whether the agreement was fair and equitable, we conclude that the opportunity to consult with independent counsel is not a *sine qua non* under common law. To the extent that *McKee–Johnson* and *Serbus* could be read to indicate otherwise, they are overruled on that issue.

We hold that the opportunity to consult with independent counsel is not a requirement, but is one of several relevant

factors that courts may consider when determining whether an antenuptial agreement is fair and equitable and therefore enforceable under common law. We reverse the court of appeals' decision and conclude that the district court erred when it granted Lillian's motion for summary judgment and ruled that the antenuptial agreement is invalid.

## II.

■ James asks us to conclude not only that the district court erred when it granted Lillian's motion for summary judgment, but also that the district court erred in not granting his motion for summary judgment, which argued that the antenuptial agreement is valid and enforceable. We must construe the evidence in the light most favorable to Lillian when assessing whether James's motion for summary judgment should have been granted. *See Isles Wellness, Inc.,* 703 N.W.2d at 516. Based on the record before us, we cannot say that the agreement was fair and equitable as a matter of law and that James is entitled to summary judgment. When we construe the evidence in the light most favorable to Lillian, we are faced with factual disputes as to whether Lillian had knowledge of her rights in the absence of the agreement and how the agreement affected those rights, and whether the agreement was the product of duress or undue influence. Therefore, we remand this case for further proceedings to determine if the antenuptial agreement is enforceable.

## III.

■ Because we are remanding, we also take this opportunity to provide guidance on the burden of proof that should apply in this type of case. In *Serbus,* we concluded that "[a]t common law, the burden of proving full disclosure of assets and knowledge of right to independent legal counsel rests with the proponent of the antenuptial contract." 324 N.W.2d at 385.[8] We reached that conclusion, however, only *after* we found that the antenuptial agreement in that case was not supported by sufficient consideration. Because of that finding of inadequate consideration, we concluded:

> *Thus,* there is a presumption of fraud under *Slingerland. In such a situation* at common law, the burden rested upon the party who retained the greater interest "to show there was no fraud or concealment, and that [the other party] knew the extent, character, and value of his property and the nature and extent of her rights as his wife and widow."

*Id.* at 385 (citing *Slingerland,* 115 Minn. at 275, 132 N.W. at 328) (emphasis added). The determination that the consideration was inadequate was a precondition to our conclusion in *Serbus* that the burden of proof was on the proponent of the antenuptial agreement.

A review of other common law cases confirms that inadequate consideration is a precondition for placing the burden of proof on the proponent of an antenuptial agreement. For example, in *Gartner,* we said that "[w]here the parties stand in a confidential relation to each other, and there is an absence or inadequacy of con-*

---

**8.** In *McKee–Johnson,* we said that "[u]nder the common law, the proponent of the agreement had the burden of demonstrating the procedural fairness of the agreement at its inception." 444 N.W.2d at 265. But we cited only *Serbus* in support of this statement. We also said that Minn.Stat. § 519.11, "unlike the common law which had placed on the proponent of the agreement the burden of establishing procedural fairness, shifted the burden to the party contesting the validity of the agreement to establish lack of the statutorily defined procedural fairness requirements." *McKee–Johnson,* 444 N.W.2d at 263. This statement also appears to have been based on our ruling in *Serbus.*

*sideration,* a presumption of fraud arises to cast upon the party seeking to uphold the contract the burden of showing that he procured the contractual benefits righteously." *Gartner,* 246 Minn. at 323–24, 74 N.W.2d at 813 (emphasis added). Additionally, in *Slingerland,* we said:

> [M]ere inadequacy of consideration alone is not generally a ground for setting aside a contract. But it shows the unconscionable character of the contract, and *raises a presumption of fraud,* which may be overcome by evidence. The relations between the parties were confidential. Clearly *the burden rested upon defendant to overcome this presumption, to show there was no fraud or concealment, and that plaintiff knew the extent, character, and value of his property and the nature and extent of her rights as his wife and widow.*

115 Minn. at 274–75, 132 N.W. at 328 (emphasis added); *see also Welsh,* 150 Minn. at 25, 184 N.W. at 39 ("The entire absence of provision for plaintiff has been held * * * to impose upon the husband the burden of showing, if he would sustain the contract, that there was no fraud or concealment, and that the prospective wife knew the extent, character and value of the prospective husband's property and the nature and extent of her rights as his wife and widow."); *In re Malchow's Estate,* 143 Minn. 53, 59, 172 N.W. 915, 917 (1919) ("In addition to inadequacy of consideration, there must be a confidential relationship between the parties before fraud will be inferred.").

 We therefore conclude that under common law the burden of proof is on

the proponent of an antenuptial agreement when (1) the parties stand in a confidential relationship and (2) the agreement is not supported by adequate consideration. But when, as in this case, the parties stand in a confidential relationship and the district court finds that the antenuptial agreement is supported by adequate consideration,[9] we conclude that under common law the burden is on the party challenging the agreement. This conclusion is consistent with our previous statements that antenuptial agreements are treated favorably under the common law of this state. *E.g., Gartner,* 246 Minn. at 323, 74 N.W.2d at 812–13 ("Antenuptial contracts in anticipation of marriage, fixing the rights which the survivor shall have in the property of the other after his or her death, are not against public policy but are regarded with favor as conducive to the welfare of the parties making them, and these contracts will be sustained whenever equitably and fairly made."). Placing the burden of proof on the party challenging the agreement is also consistent with general principles of contract law. *See, e.g., Hafner v. Schmitz,* 215 Minn. 245, 250, 9 N.W.2d 713, 715 (1943) ("[Undue] influence must be such that it overcomes the volition of the person influenced. And the burden of proof is upon the party asserting it.").

In this case, the district court found that there was sufficient consideration for the antenuptial agreement. Thus, the burden of proof for the remaining factors should not be on James as the proponent of the antenuptial agreement, but on Lillian as the party challenging that agreement.

---

**9.** Lillian acknowledges the district court's finding that the agreement was supported by adequate consideration, but argues in her brief that the agreement was substantively unfair. We decline to address the substantive fairness issue because we granted review on the more narrow issue of whether an antenuptial agreement is invalid as a matter of law when the party challenging the agreement did not have the opportunity to consult with independent counsel.

Reversed and remanded to the district court for further proceedings consistent with this opinion.