*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-2259
A13-2281**

In re the Marriage of:  Brian D. Peterson, petitioner,
Appellant,

vs.

Joyce Marie Deeb,
Respondent.

**Filed April 27, 2015
Affirmed
Hooten, Judge**

Dakota County District Court
File No. 19HA-FA-12-103

J. Virgil Bradley, Rachael C. Peters, Cornerstone Family Law, LLC, Minneapolis, Minnesota (for appellant)

Patricia A. O'Gorman, Patricia A. O'Gorman, P.A., Cottage Grove, Minnesota (for respondent)

Considered and decided by Schellhas, Presiding Judge; Stauber, Judge; and Hooten, Judge.

**U N P U B L I S H E D   O P I N I O N**

**HOOTEN**, Judge

In these consolidated appeals in a marital dissolution matter, appellant-husband argues that the district court erred by: (1) not enforcing the parties' antenuptial agreement; (2) miscalculating respondent-wife's nonmarital interest in real property; and

(3) appointing a receiver to liquidate real property. In her related appeal, respondent-wife argues that the district court abused its discretion by admitting evidence of appellant-husband's alleged nonmarital interest in real property. We affirm.

**FACTS**

Appellant-husband Brian D. Peterson and respondent-wife Joyce Marie Deeb were married in 1999. Peterson petitioned for dissolution of the marriage in January 2012. After a five-day trial in April 2013, the district court issued a judgment and decree dissolving the marriage and determining child custody, child support, property division, and other issues. The parties do not contest any issues relating to child custody or child support, but both parties appeal from the district court's division of real property in light of the parties' rights under their antenuptial agreement.

Before the parties married, Deeb was the sole owner of residential real property located in Inver Grove Heights (the homestead). At the time of marriage, the fair-market value of the homestead was $240,000, the homestead was encumbered by a mortgage in the amount of $165,000, and Deeb therefore had equity in the homestead in the amount of $75,000. In the antenuptial agreement, the parties disclosed all of their assets, and they were represented by independent counsel when they negotiated its terms and entered into the agreement. Under the agreement, Deeb retained her $75,000 nonmarital interest in the homestead, but any "future increase in value or equity" of the homestead would be considered marital property. According to the agreement, within 30 days after the marriage, the homestead was to be transferred into joint tenancy and both parties were to become joint obligors of the mortgage on the homestead. Exhibit B, which was attached

2

to the agreement, indicated that Peterson owned a nonmarital asset called "Zurich Money Market" (the Zurich account) that was worth $15,417 at the time of marriage.

In 2005, the parties refinanced the homestead in order to purchase a cabin. Prior to refinancing, the "appraised value" of the homestead was $429,000, which was encumbered by a mortgage of $146,387.06. Therefore, the total equity in the homestead was $282,612.94, which consisted of Deeb's $75,000 nonmarital equity as well as marital equity of $207,612.94. The purchase price of the cabin was approximately $225,000, and of that amount, $173,612.94 of the purchase price was paid with funds obtained through the refinancing of the homestead. Peterson also contributed nonmarital funds toward the purchase of the cabin that were later traced to the Zurich account. By applying funds obtained by the refinancing of the homestead, as well as other funds, the parties were able to purchase the cabin without having to obtain a mortgage on the cabin. As a result of the refinancing and the purchase of the cabin, the homestead was encumbered by a new mortgage in the amount of $320,000, and $109,000 of equity remained in the homestead.

In 2008, the parties purchased rental property for $88,000. The rental property was financed in part by encumbering the cabin with a home equity line of credit in the amount of $45,230.24. At the time of dissolution, the rental property was unencumbered and was being used as rental property.

Upon dissolution, the district court awarded Deeb the homestead and ordered that she was responsible for paying the mortgage. The fair-market value of the homestead at the time of dissolution was $276,000, and it was encumbered by a mortgage in the amount of $278,000. In interpreting and enforcing the antenuptial agreement, the district

court found that Deeb had a $75,000 nonmarital interest that "persists in the marital estate" and that Peterson had a $15,417 nonmarital interest in the cabin. The district court ordered that the parties sell the cabin and, out of the net proceeds of the sale, pay Deeb $75,000 for her nonmarital interest and Peterson $15,417 for his nonmarital interest in the cabin. The remaining proceeds from the sale of the cabin were to be equally distributed as marital property. The district court also ordered the parties to sell the rental property and distribute the proceeds as marital property, but gave Peterson the opportunity to purchase the rental property if he paid Deeb her share.

These appeals followed.

## D E C I S I O N

A district court's division of property upon marital dissolution is reviewed for an abuse of discretion. *Antone v. Antone*, 645 N.W.2d 96, 100 (Minn. 2002).

## I.

Peterson acknowledges that Deeb had a $75,000 nonmarital interest in the homestead at the time of marriage and that the distribution of the parties' property upon dissolution is governed by their antenuptial agreement. But, he disputes the district court's interpretation and enforcement of the antenuptial agreement. Under Peterson's interpretation of the antenuptial agreement, Deeb's nonmarital interest was extinguished when the parties refinanced the homestead and the value of the homestead decreased. The district court rejected Peterson's interpretation, concluding that the interpretation and enforcement of the agreement so as to extinguish Deeb's nonmarital interest would be substantively unfair and "unconscionable." We agree.

4

Generally, Minnesota public policy favors the freedom to contract. *Lyon Fin. Servs., Inc. v. Ill. Paper & Copier Co.*, 848 N.W.2d 539, 545 (Minn. 2014). Under freedom of contract principles, "parties are generally free to allocate rights, duties, and risks." *Id.* Consistent with this public policy, "[a]n antenuptial agreement is a type of contract recognized and favored at common law." *Pollack-Halvarson v. McGuire*, 576 N.W.2d 451, 455 (Minn. App. 1998), *review denied* (Minn. May 28, 1998). Minnesota has "long recognized" the validity of antenuptial agreements, which alter the statutory dissolution schemes regarding the disposition of both marital and nonmarital property. *See McKee-Johnson v. Johnson*, 444 N.W.2d 259, 263–65 (Minn. 1989), *overruled on other grounds by In re Estate of Kinney*, 733 N.W.2d 118 (Minn. 2007).

The common-law procedural requirements applicable to the execution of a valid antenuptial agreement were codified in 1979. *Id.* at 263; *see also* Minn. Stat. § 519.11, subd. 6 (2014). The statute provides that two people of legal age may enter into an antenuptial agreement in order to determine what rights each party has in his or her nonmarital property upon dissolution of the marriage. Minn. Stat. § 519.11, subd. 1 (2014). Under the statute, an antenuptial agreement is valid and enforceable if "(a) there is a full and fair disclosure of the earnings and property of each party, and (b) the parties have had an opportunity to consult with legal counsel of their own choice." *Id.* If the agreement complies with these procedural requirements, a party challenging the validity of the agreement has the burden of proof to demonstrate its invalidity. *Id.*, subd. 5 (2014).

"Whether an antenuptial agreement is valid is a question of law subject to de novo review." *Siewert v. Siewert*, 691 N.W.2d 504, 506 (Minn. App. 2005), *review denied* (Minn. May 17, 2005). Neither party argues that the antenuptial agreement is procedurally invalid. The parties made a full and fair disclosure of their earnings and property at the time of the agreement, both parties signed the agreement, and both were represented by legal counsel.

The issue that was presented to the district court was the interpretation and enforcement of the following language in the agreement:

> 3.1 <u>Rights During Marriage.</u> During the marriage of the parties:
>
> . . . .
>
> 3.1.3 Neither party shall acquire by reason of the contemplated marriage . . . any interest in, or right to control[,] the other's Non-Marital Property.
>
> 3.1.4 The Non-Marital Property of each party shall be subject to such party's exclusive control and use, and each party shall have the right to encumber and transfer any of such party's Non-Marital Property upon his or her sole signature.
>
> . . . .
>
> 3.2 <u>Rights Upon Dissolution or Separation.</u> Upon . . . a termination of the marriage of the parties by divorce, dissolution, or annulment:
> 3.2.1 Each party shall retain his or her Non-Marital Property, as the same is set out in the attached Exhibits A and B, and as otherwise defined herein, free of any right or claim of the other, including any right or claim to alimony or maintenance.

6

3.2.2 Any assets acquired during the marriage from the Non-Marital Property of both parties shall be divided between the parties in proportion to the actual monetary consideration provided by each party, and any such assets that cannot be so divided shall be sold and the net proceeds attributable to each party's contribution shall be distributed to each such party.

. . . .

3.5 <u>Rights With Respect to [the Homestead].</u>   The [homestead] is the residence of the parties hereto and is owned by [Deeb].   Currently the [homestead's] value is $240,000 and the outstanding loan (which is in [Deeb's] name alone) secured by the [homestead] is $165,000. Accordingly, [Deeb] has equity in the [homestead] of $75,000.  The parties agree that within thirty (30) days after the solemnization of the parties' marriage they will place said [homestead] into joint tenancy in the name of the parties hereto and the [homestead] shall, after marriage, be treated as follows:

[3.5.1] For purposes of paragraphs 3.1 and 3.2, . . . Deeb's current equity in the [homestead] of $75,000 shall be treated as Non-Marital Property.  Any future increase in value or equity in the [homestead] shall be Marital Property.  The loan secured by the [homestead], though in [Deeb's] sole name, shall hereafter be the joint obligation of the parties.

Attached to the agreement as Exhibit A was a listing of all of the nonmarital property owned by Deeb prior to the marriage, which included her equity in the homestead. Exhibit B listed all of Peterson's nonmarital property.

"Absent ambiguity, the interpretation of a contract is a question of law." *Embree v. U.S. Bank Nat'l Ass'n*, 828 N.W.2d 141, 145 (Minn. App. 2013) (quotation omitted). "The plain and ordinary meaning of the contract language controls, unless the language is ambiguous." *Bus. Bank v. Hanson*, 769 N.W.2d 285, 288 (Minn. 2009).  "Whether a contract is ambiguous is a question of law that we review de novo.  The language of a

contract is ambiguous if it is susceptible to two or more reasonable interpretations." *Dykes v. Sukup Mfg. Co.*, 781 N.W.2d 578, 582 (Minn. 2010) (citations omitted).

The overriding purpose of contract interpretation is to give effect to the parties' intent. *Turner v. Alpha Phi Sorority House*, 276 N.W.2d 63, 66 (Minn. 1979). In ascertaining the parties' intent, the district court is to construe the contract as a whole and try to harmonize all of its provisions. *Chergosky v. Crosstown Bell, Inc.*, 463 N.W.2d 522, 525 (Minn. 1990). In doing so, the court should avoid any interpretation that would render a contract provision meaningless. *Id.* at 526.

In the instant case, the overriding purpose and intent of the parties in entering into the antenuptial agreement was to protect and preserve the parties' nonmarital property upon dissolution. The plain and unambiguous language of section 3.2.1 provides that, upon dissolution, each party "shall retain his or her Non-Marital Property." Moreover, the plain and unambiguous language of section 3.2.2 provides that any assets acquired during marriage from the nonmarital property of "both parties shall be divided between the parties in proportion to the actual" nonmarital funds provided by each party, and any such acquired assets "that cannot be so divided shall be sold and the net proceeds attributable to each party's contribution shall be distributed to each such party." There is no indication in any provision of the agreement that the purchase of other assets during marriage with nonmarital funds, or the possible commingling of nonmarital funds with marital funds in making such purchases, would extinguish or eliminate the parties' nonmarital interests.

The district court found that, at the time of the dissolution, the parties' marital and nonmarital equity in the homestead had been essentially "stripped" by the 2005 refinancing and by the subsequent decline in the market value of the homestead. Consistent with the parties' intent as set forth in the agreement, the district court concluded that the parties' nonmarital interests in their real property could be satisfied by selling the cabin and the rental property and then reimbursing the parties for their nonmarital contributions to the purchase of these after-acquired assets. The district court awarded Deeb $75,000 for her original nonmarital interest in the homestead and awarded Peterson $15,417 for his nonmarital contribution toward the purchase of the cabin.

There is no merit to Peterson's argument that Deeb's $75,000 nonmarital interest was extinguished when the parties refinanced the homestead. There is no dispute that, when the parties refinanced the homestead in 2005 in order to buy the cabin, they borrowed against their marital and nonmarital interests in the homestead. Moreover, Peterson cites no language in the agreement mandating that Deeb's $75,000 interest would be extinguished if the homestead were refinanced. In fact, under section 3.2.2, the agreement not only anticipates the use of the parties' nonmarital property for the purchase of other assets during marriage, but also provides a mechanism for reimbursing the parties based upon their respective contributions to the acquisition of those assets. Even though there was no longer any equity in the homestead at the time of dissolution because of the 2005 refinancing and the subsequent decline in the market value of the homestead, this did not mean that Deeb's $75,000 nonmarital interest disappeared. Because the funds obtained from the refinancing were used to purchase the cabin, and

9

funds from the mortgaging of the cabin were later used to purchase the rental property, Deeb's $75,000 interest can be traced into the real property assets that the parties acquired using funds generated by the refinancing of first the homestead and then the cabin.

Peterson argues that, because Deeb's $75,000 nonmarital interest in the homestead is the only nonmarital interest specifically mentioned in the body of the agreement in section 3.5, this nonmarital interest cannot exist except as equity in the homestead and is solely governed by this provision. Under this interpretation of the agreement, upon dissolution, Deeb's nonmarital interest could only exist as equity in the homestead and, because there was no equity interest in the homestead, her nonmarital interest no longer existed. This argument fails on numerous grounds.

First, Peterson ignores the fact that section 3.5 of the agreement states, "For purposes of paragraphs 3.1 and 3.2, . . . Deeb's current equity in the property of $75,000 shall be treated as Non-Marital Property." Section 3.1 sets forth the parties' rights regarding their nonmarital property during the marriage, while section 3.2 sets forth the rights of the parties relative to their nonmarital property upon dissolution. The reference to these sections in section 3.5 does not support Peterson's interpretation that Deeb's nonmarital homestead interest is to be construed only under section 3.5, but rather evinces the intent of the parties that Deeb's homestead interest was to be governed by sections 3.1 and 3.2. This necessarily includes section 3.2.2, which provides for the utilization of both parties' nonmarital property to purchase assets during the marriage without destroying the nonmarital character of the property, as well as a mechanism for

10

the division and distribution of nonmarital property upon the sale of the after-acquired assets. As further support of the interplay between sections 3.5 and 3.2, Deeb's nonmarital interest in the homestead is listed in Exhibit A, which is incorporated by reference in section 3.2.1.

Second, there are other reasons why it was necessary for the agreement to contain a separate provision regarding Deeb's nonmarital interest in the homestead. Section 3.5 provides that the homestead was to be placed in joint tenancy with rights of survivorship. In addition, the parties agreed that any loan on the homestead was to be the joint obligation of the parties and that any "future increase in value or equity in the [homestead] shall be Marital Property." Third, contrary to Peterson's interpretation, there is nothing in section 3.5 that exempts Deeb's nonmarital homestead interest from the provisions of sections 3.1 and 3.2 or provides for an alternative division or distribution of her interest under section 3.5. Since we are required to construe the contract as a whole and harmonize in order to give effect to all of the provisions of the agreement, section 3.5 must be interpreted so that it is consistent with the other provisions of the agreement set forth in sections 3.1 and 3.2.

Peterson alternatively argues that, even if Deeb had a right to recover all or a portion of her $75,000 nonmarital equity claim, the district court erred by failing to strictly trace Deeb's nonmarital interest in the homestead to the parties' after-acquired assets and by failing to utilize the formula set forth in *Schmitz v. Schmitz*, 309 N.W.2d 748 (Minn. 1981), in its division of the parties' marital and nonmarital real property interests. But here, the parties effectively contracted away application of the *Schmitz*

11

formula for determining the parties' marital and nonmarital interests in the homestead. Section 3.5.1 of the agreement provides that any increase in value or equity in the homestead is marital property, and section 3.2.2 governs the division of any assets acquired by the nonmarital funds of both parties.

Peterson argues that the district court erred when it invalidated the antenuptial agreement and declared it to be unconscionable without making adequate findings or analysis. But, the district court did not invalidate the antenuptial agreement. Rather, the district court concluded that Peterson's "propose[d]" interpretation of section 3.5 would lead to an "unconscionable" result—namely, the extinguishment of Deeb's $75,000 nonmarital interest. In rejecting Peterson's unreasonable interpretation of the agreement, the district court concluded that Deeb's "non-marital interest persists, even though the [homestead] is currently worth less than the mortgage balance."

A contract is unconscionable if it is "such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other." *In re Estate of Hoffbeck*, 415 N.W.2d 447, 449 (Minn. App. 1987), *review denied* (Minn. Jan. 28, 1988) (quotation omitted). "If a court determines that a contract contains an unconscionable clause, it may refuse to enforce the contract, enforce it without the offending language, or limit application of the unconscionable clause to avoid any unconscionable result." *Kauffman Stewart, Inc. v. Weinbrenner Shoe Co.*, 589 N.W.2d 499, 502 (Minn. App. 1999) (quotation omitted).

During the trial, both parties admitted that the antenuptial agreement was valid and only disputed its interpretation and enforcement. There is no evidence in the record that

the agreement was invalid under Minn. Stat. § 519.11, subd. 1, or that the district court found that section 3.5 was procedurally unconscionable. By rejecting Peterson's unreasonable interpretation of the agreement and adopting an interpretation of the agreement that satisfied the parties' intent to protect their nonmarital interests upon dissolution, it was not necessary for the district court to find that section 3.5 was unconscionable or void. As set forth above, the district court's interpretation of the agreement is consistent with sections 3.1, 3.2, and 3.5, as well as the overriding intent of the parties' agreement that each would retain his or her nonmarital interests upon dissolution. *See id.* at 501 ("Contract terms are read in the context of the entire contract.").

Finally, and most significantly, the district court enforced the agreement in a manner that was fair and equitable. An antenuptial agreement may be reviewed for substantive fairness at "the time of execution, the time of enforcement, or both." *McKee-Johnson*, 444 N.W.2d at 266. At the time Deeb married Peterson and signed the antenuptial agreement, the only real property equity that the parties had was Deeb's $75,000 nonmarital interest in the homestead. Upon dissolution, the total equity in all of the real estate holdings owned by either or both parties had increased to a total of $235,000.[1] Deeb's nonmarital interest award of $75,000 constituted 31.9% of the parties'

---

[1] We accept for present purposes the district court's determination of the market values of the real properties and the encumbrances for the three properties. At the time of dissolution, as a result of their investment with funds obtained by mortgaging their marital and nonmarital interests in the homestead, the parties owned three properties with a fair market value of approximately $593,000, which consisted of a fair market value of $276,000 for the homestead, $177,000 for the cabin, and $140,000 for the rental property.

total equity, and Peterson's nonmarital interest award of $15,417 constituted 6.6% of the parties' total equity. After deducting the parties' nonmarital awards, there was $144,583, or 61.5%, of the total equity remaining for distribution as marital property. On this record, this appears to be a fair and equitable distribution under the parties' agreement, and certainly more fair than that proposed by Peterson, which would have essentially shifted all of the marital liabilities relating to the purchases of the other real property to the homestead, thereby eliminating Deeb's nonmarital interest.

Not only was the district court's property distribution fair and reasonable, it also achieved the parties' goal as set forth in their antenuptial agreement that their nonmarital interests were to be protected upon dissolution. By rejecting Peterson's unreasonable interpretation as inconsistent with the parties' intent in preserving their nonmarital interests, the district court did not err in its interpretation and enforcement of the parties' agreement.

## II.

In her related appeal, Deeb argues that the district court abused its discretion by admitting evidence of, and then awarding the distribution of, Peterson's nonmarital contribution of $15,417 toward the purchase of the cabin. She argues that Peterson violated the discovery rules of civil procedure by failing to disclose documentation of this nonmarital claim prior to trial and that the evidence was insufficient to prove such

---

These properties were encumbered by loans totaling approximately $358,000, which consisted of a $278,000 loan on the homestead and an $80,000 home equity line of credit on the cabin, leaving an aggregate real property estate of $235,000 ($593,000 less $358,000).

14

nonmarital contribution. "The admission of evidence rests within the broad discretion of the trial court and its ruling will not be disturbed unless it is based on an erroneous view of the law or constitutes an abuse of discretion." *Kroning v. State Farm Auto. Ins. Co.*, 567 N.W.2d 42, 45–46 (Minn. 1997) (quotation omitted).

## A.    Discovery

"[F]ailure to truthfully answer interrogatories may lead to the suppression of . . . evidence." *Gebhard v. Niedzwiecki*, 265 Minn. 471, 476, 122 N.W.2d 110, 114 (1963). "Before drastic sanctions are imposed, [however], it should appear that violation of the rule has [resulted] or will result in prejudice to the party asserting a violation." *Id.* at 478, 122 N.W.2d at 115.

It is undisputed that, at the time of marriage, Peterson owned the Zurich account, a nonmarital asset worth $15,417. Deeb alleges that, during discovery, she asked Peterson to disclose information concerning any of his nonmarital claims, along with any supporting documentation. She alleges that Peterson "claimed to have no documents in his [a]nswers to discovery and that [a] 'detailed explanation' would be 'forthcoming.'" She further alleges that Peterson never provided this "detailed explanation" until he was called as a rebuttal witness at trial.

At trial, Deeb's trial counsel objected to the introduction into evidence of both Peterson's testimony and documentary evidence regarding the Zurich account that allegedly was not disclosed during discovery. In response, Peterson's trial counsel stated that the documents had been provided during discovery when his trial counsel "delivered at least three big bankers boxes" of discovery to Deeb's trial counsel. On that basis, the

district court received Peterson's testimony and documents regarding the Zurich account into evidence, as well as additional documents of a similar nature.

Because they were not filed with the district court, Peterson's answers to interrogatories are not part of the record on appeal. *See* Minn. R. Civ. App. P. 110.01 ("The documents filed in the trial court, the exhibits, and the transcript of the proceedings, if any, shall constitute the record on appeal in all cases."). On this record, we conclude that Deeb's allegations alone are insufficient to prove that Peterson failed to truthfully answer interrogatories and fully produce documents during discovery. As such, we need not examine whether Deeb was prejudiced by the introduction of this evidence. *See Gebhard*, 265 Minn. at 478, 122 N.W.2d at 115.

## B.    Evidentiary Issue

A spouse seeking to claim nonmarital property must prove its nonmarital character by a preponderance of the evidence. *Swick v. Swick*, 467 N.W.2d 328, 330 (Minn. App. 1991), *review denied* (Minn. May 16, 1991). "A nonmarital interest in property may be established on the basis of credible testimony." *Kerr v. Kerr*, 770 N.W.2d 567, 570 (Minn. App. 2009). Peterson testified that, at some point during the marriage, the Zurich account was acquired by Scudder and was later acquired by ING. He also testified and presented evidence establishing that, in 2005, he transferred $20,000 out of the ING account and applied those funds toward the purchase of the cabin. The district court found that Peterson's testimony was credible and that he had a nonmarital interest in the cabin in the amount of $15,417, the original amount of the Zurich account. We conclude that the district court did not abuse its discretion by admitting evidence that established

the existence of Peterson's nonmarital contribution to the purchase of the cabin and enforcing the parties' agreement that each party was to retain his or her nonmarital property upon dissolution.

## III.

As part of the judgment and decree, the district court ordered Peterson either to sell the cabin and rental property, or to buy out Deeb's nonmarital interest in these properties. Peterson failed to do so. As a result, Deeb moved for the appointment of a receiver to "liquidate the [parties'] real property." In October 2013, at the beginning of a hearing on Deeb's motion, the district court stated, "It looks like we're in agreement that a receiver should be appointed[.] I'm happy to do that." Peterson's attorney did not object to this statement by the district court. The next day, the district court issued an order appointing a receiver to liquidate all of Peterson's real, personal, and mixed property "for the benefit of [Deeb] and the parties' creditors." Although Peterson's trial counsel later submitted a letter to the district court objecting to the appointment of a receiver and requesting that the district court reconsider its order, the district court never responded to this letter. The receiver exercised his duties and was discharged in September 2014.

On appeal, Peterson claims that he never agreed to the appointment of a receiver to liquidate the real property and that the district court erred by appointing a receiver. But, this issue is not properly before this court. "A reviewing court must generally consider only those issues that the record shows were presented [to] and considered by the trial court in deciding the matter before it." *Thiele v. Stich*, 425 N.W.2d 580, 582

17

(Minn. 1988) (quotation omitted). While prior to the hearing, Peterson responded to Deeb's motion for a receiver, he did not object during the hearing when the district court indicated on the record that the parties had agreed to the appointment of a receiver. Peterson's counsel's subsequent letter raised several objections to the appointment of a receiver. But, these objections were never "presented [to] and considered by the trial court," *see id.*, and therefore these objections are not properly before this court.

**Affirmed.**